IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

_____

UNITED STATES OF AMERICA,

        Plaintiff,

   -vs-
                             Criminal Docket
                                 No. 15-49-BLG-SPW
WILLIAM KRISSTOFER WOLF,        Court of Appeals
                                 No. 16-30065
        Defendant.

_____

TRANSCRIPT OF SENTENCING PROCEEDINGS

Heard in Snowy Mountains Courtroom
James F. Battin United States Courthouse
2601 Second Avenue North
Billings, Montana
March 3, 2016
10:33 a.m.

BEFORE THE HONORABLE SUSAN P. WATTERS

UNITED STATES DISTRICT JUDGE

TINA C. BRILZ, RPR, FCRR
Official Court Reporter
United States District Court
James F. Battin United States Courthouse
2601 Second Avenue North, Room 4209
Billings, Montana  59101

Proceedings recorded by mechanical stenography, transcript
produced by computer.

A P P E A R A N C E S :


PRESENT ON BEHALF OF THE PLAINTIFF, THE UNITED
STATES OF AMERICA:

                MR. BRYAN R. WHITTAKER
                Assistant U.S. Attorney
                OFFICE OF THE U.S. ATTORNEY
                Paul G. Hatfield United States Courthouse
                901 Front Street, Suite 1100
                Helena, Montana  59626

                    and

                MS. DANYA E. ATIYEH
                Assistant U.S. Attorney
                U.S. DEPARTMENT OF JUSTICE
                    - NATIONAL SECURITY DIVISION
                Counterterrorism Section
                950 Pennsylvania Avenue Northwest
                Washington, DC 20530


PRESENT ON BEHALF OF THE DEFENDANT, WILLIAM KRISSTOFER
WOLF:

                MR. MARK S. WERNER
                Assistant Federal Defender
                FEDERAL DEFENDERS OF MONTANA
                    - Billings Branch
                2702 Montana Avenue, Suite 101
                Billings, Montana  59101-2372

1    The following proceedings were had:

2

3            THE COURT:  Please be seated.

4        Emily, would you please call the next matter on the

5    calendar.

6            CLERK OF COURT:  Yes, Your Honor.

7        The court has set aside this time to hear the matter of

8    CR-15-49-BLG-SPW, United States versus William Krisstofer Wolf.

9        This is the time set aside for a sentencing.

10           THE COURT:  And for the record, Bryan Whittaker and

11   Danya Atiyeh?

12           MS. ATIYEH:  Atiyeh.  That's right, Your Honor.

13           THE COURT:  Is that close?  Okay.

14       Appear on behalf of the government.  Mark Werner appears

15   on behalf of the defendant.  The defendant is present.

16       I have received and reviewed the presentence report and

17   the sentencing memoranda filed by the parties.

18       Mr. Whittaker, did you receive and review the presentence

19   investigation report?

20           MR. WHITTAKER:  Yes, Your Honor.

21           THE COURT:  Do you have any objections to that

22   report?

23           MR. WHITTAKER:  We do not.

24           THE COURT:  Mr. Werner, did you receive and review

25   the presentence report?

1          MR. WERNER:  Yes, Your Honor.

2          THE COURT:  And did you have an opportunity to go

3   through that report in its entirety with Mr. Wolf?

4          MR. WERNER:  Yes, Your Honor.

5          THE COURT:  And you have a couple of objections to

6   that report; correct?

7          MR. WERNER:  I'm objecting to the two enhancements

8   that are set forth in the revised presentence report.

9          THE COURT:  Okay.

10      So, in the addendum to the presentence report, there is

11   objection Number 1.  Are you -- which talks about some comments

12   made in paragraph 6 of 26.

13      Are you withdrawing that objection?  It doesn't affect the

14   guideline calculation.  It was just that --

15          MR. WERNER:  Oh, Judge, I'm not asking for

16   adjudication on that.  I'm asking for adjudication on the two

17   sentencing enhancements in the underlying rationale.

18          THE COURT:  Okay.

19      So, that was mostly to note the defendant's position.

20          MR. WERNER:  Yes.  Mr. Wolf wanted to preserve his

21   record.

22          THE COURT:  Okay.

23      Very good.

24      So, the defendant is objecting to the four-level

25   enhancement that the presentence author has recommended.  And

1   that enhancement is pursuant to United States Guidelines
2   Section 2K2.1 Sub (b)(6)(B), and then the defendant is
3   objecting to the two-level enhancement for obstruction of
4   justice pursuant to Sentencing Guideline Section 3C1.1.
5       So, Mr. Whittaker, do you have testimony related to -- to
6   those objections today?
7           MR. WHITTAKER:  Yes.  We have brief testimony, Your
8   Honor, and if it's permissible to the court, Ms. Atiyeh would
9   like to handle the guideline calculation part of the
10  government's case today, and then I would handle the sentence
11  that we would advocate before the court later in the hearing,
12  if that's permissible with Your Honor.
13          THE COURT:  That's fine.
14          MR. WHITTAKER:  So, we do have brief testimony and
15  argument about those two enhancements.
16          THE COURT:  Go ahead.  And then I'll hear from you,
17  Mr. Werner.
18          MS. ATIYEH:  Your Honor, can I begin briefly with
19  some argument, and then call our witness?
20          THE COURT:  Sure.
21          MS. ATIYEH:  Thanks.
22      I'd like to start by discussing the 2K2.1(b)(6)(B)
23  four-point enhancement.  And the government filed in its
24  sentencing paper, attachment A, which fairly exhaustively lists
25  all of the defendant's statements about his intent to commit

1  other crimes using the machine gun.

2      The 2K2.1 provision applies, according to the application

3  notes, if the firearm facilitated or had the potential of

4  facilitating another felony offense.

5      And the probation office has identified in the PSR a

6  number of Montana Code offenses that apply in this case.  They

7  mentioned assault with a weapon, assault on a peace officer,

8  and arson, which we've addressed in our sentencing memorandum.

9      I just wanted to note for the record, and I think we put

10 this in a footnote, that there are potentially any number of

11 other felonies that might also apply, including various

12 homicide felonies.

13     I don't want to go back through all of the comments that

14 the defendant made, because we listed them in our attachment.

15 I just wanted to draw the court's attention to the statement

16 that the defendant made just moments before he took possession

17 of the machine gun, when he told Dirty:  "I just need to kill

18 the public officials."  And went on to say:  "I guarantee, the

19 first few politicians and judges that have their heads blown

20 off, the rest of them are going to go into hiding."

21     In his own testimony when he spoke about the gun, he

22 mentioned that when the war starts, I want to put this as

23 bluntly as possible:  "I would rather go out and scare the

24 living hell out of some police officers who are going to

25 violate your civil rights."

1        All of these statements go toward any number of these
2   offenses, assault with a weapon and assault with a peace
3   officer, which, as Your Honor is well aware, an assault can
4   take place by simply threatening a peace officer with a gun.
5   Even the defendant's own testimony, even if he weren't to shoot
6   these police officers, he'd be committing an assault by
7   threatening them with the machine gun.

8        And the defendant consistently testified that this was in
9   the event of this war that was going to happen with the
10  government.

11       And what I really want to highlight for Your Honor is that
12  this war is something that was imminent in the defendant's
13  mind.  He said in his own testimony, "if" is no longer a
14  question in his mind.  This was something that was imminent.
15  And it's also something that is extrajudicial.

16       When the defendant was talking about the citizen's arrests
17  he wanted to enact, he talked about going to all sorts of law
18  enforcement and judicial authorities, going to the marshals,
19  going to the FBI, and going to the UN and going to the World
20  Court.  And when they all turned him down, when they all said,
21  "This isn't the law.  This isn't how it works," he wanted to go
22  ahead with it anyway.

23       And when the defendant's talking about a war, he's not
24  talking about the sort of thing where Congress is declaring war
25  on him.  He's talking about a war that exists in his mind.  And

1  that's the real -- the real threat here.  These are crimes that
2  he was ready, willing, and able to commit once he got the gun
3  and once he decided that this war started.

4      When he purchased the machine gun, it was with the intent
5  to use it to facilitate all of these crimes, these assaults,
6  this arson.  And that's why his statements just as he took
7  possession of the weapon is so critical, when he made that
8  initial statement, he's just about to take possession, and he
9  says:  "I need to kill the public officials."

10      It's critical because that's what was on his mind when he
11 took possession of the gun.  That's what he was thinking of;
12 that's what was going through his head.  These are the crimes
13 that he was ready and willing to commit with the weapon.

14      And for that reason, the enhancement should be applied.

15      I'd next like to move to the instruction enhancement under
16 3C1.1, which provides for the two-level increase if the
17 defendant obstructs justice; and conduct that contributes to
18 the provision includes committing perjury or providing
19 materially false information to the court.

20      And the defendant gave materially false testimony in his
21 claim that he intended for the weapon to be a fully automatic
22 converted to a semiautomatic conversion.  And that's what the
23 jury, in fact, found; this testimony was false when they
24 convicted him.

25      And the defendant -- of course, the defendant always has a

1  constitutional right to testify, but what he doesn't have a

2  right to do is to testify falsely.

3      I'd like to address a point that's made in the defendant's

4  sentencing memo.  And I think this is -- this is at the top of

5  page 5, talking about Mr. Gray's telling the truth as to there

6  not being unrecorded conversations between himself and the

7  defendant.  And I just wanted to clarify this point for the

8  record, because I think it was clear in both Mr. Gray and in

9  Special Agent Deurmeier's testimony, but there are, in fact,

10 unrecorded conversations between Mr. Gray and the defendant.

11 There were a number that we talked about before Mr. Gray began

12 wearing a wire in his meetings.  And also, there was a brief

13 period of unrecorded testimony at the December 18th meeting

14 when Dirty got up to use the restroom and Mr. Gray and the

15 defendant continued to speak.

16     But what there aren't are any -- I guess I'll call them

17 unreported conversations.  Mr. Wolf testified about meeting

18 Mr. Gray at multiple job sites, construction sites:  A hardware

19 store in Bozeman, the Black Bull Subdivision.  All of these

20 meetings, there was no report that exists in the FBI's files.

21 Mr. Gray never went to Special Agent Deurmeier and said that

22 these events happened, and their very existence was flatly

23 contradicted by Mr. Gray's testimony.

24     He was living and working several hours away in Roundup.

25 He wasn't anywhere in the area at the time of the events.

1       And Mr. Gray's testimony also flatly contradicted

2  Mr. Wolf's claim that they ever talked about an automatic

3  shotgun before December 18th at any of these unreported

4  meetings.  Or that a meeting ever existed where Mr. Wolf gave

5  him an article describing the Saiga.

6       And we just wanted to call Special Agent Deurmeier very

7  briefly to clarify some of the information that was addressed

8  in the defendant's sentencing memorandum about what happened on

9  the December 18th meeting, and mention of the Saiga in an FBI

10  report, a 1023 report.  So, could we call Special Agent

11  Deurmeier very briefly?

12              THE COURT:  You may.

13              CLERK OF COURT:  I'll have you raise your right hand.

14

15  MATTHEW DEURMEIER, having been called as a witness on behalf of

16  the United States of America, being first duly sworn according

17  to law, was examined and testified as follows:

18

19              CLERK OF COURT:  Please take a seat on the witness

20  stand.

21                     DIRECT EXAMINATION

22  BY MS. ATIYEH:

23  Q    Good morning, sir.

24       Could you just state your name and spell it for the court

25  reporter, please.

1    A     My name is Matthew Deurmeier.  D-E-U-R-M-E-I-E-R.

2    Q     I'd like to direct your attention very briefly to the

3    meeting that happened between the defendant and Mr. Gray and

4    Dirty on December 18th.

5          Do you remember this meeting?

6    A     I do.

7    Q     And did you meet with Mr. Gray after the December 18th

8    meeting?

9    A     I did.  Minutes after the meeting.

10   Q     I'm sorry?

11   A     Minutes after the meeting, we met.

12   Q     What did you talk about?

13   A     As was our common procedure, whenever he met with

14   Mr. Wolf, he would meet with me shortly thereafter, and I would

15   debrief him.  I would ask him what was said, what he observed,

16   regarding the meet between him and Mr. Wolf.

17   Q     So, at this meeting, there was Mr. Gray present and also

18   Special Agent Rogers?

19   A     Correct.

20   Q     And what did they tell you about what had occurred at the

21   meeting?

22   A     As they were approaching me, they were both discussing

23   their surprise that Mr. Wolf had brought up a Russian automatic

24   shotgun.  Neither -- according to their reactions, neither

25   Special Agent Rogers nor Mr. Gray had heard of such a weapon.

1   And when they told me that, I was surprised, as well, because I

2   had not heard of that weapon, as well.

3   Q    And at some point during your conversation, did you talk

4   with Mr. Gray specifically about what type of Russian automatic

5   shotgun the defendant had mentioned?

6   A    I did.  I asked Mr. Gray directly what did he observe over

7   the course of the meeting.  Just so I could cover everything

8   from what he observed from the very beginning to the very end.

9   And he said at one point, as Agent Rogers left the table, it

10  was just the two of them, and at that time -- or the two of

11  them, meaning Mr. Wolf and Mr. Gray.  And at that time,

12  Mr. Wolf brought up the topic of incendiary rounds for a

13  shotgun, and then he mentioned specifically a Saiga shotgun.

14  And that is what Mr. Gray reported to me on that day.

15  Q    And that is what you memorialized in your 1023 form?

16  A    That is correct.

17            MS. ATIYEH:  Nothing further.

18            THE COURT:  Cross-exam, Mr. Werner?

19            MR. WERNER:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. WERNER:

22  Q    Agent Deurmeier, just so I understand, I guess you're

23  saying -- and when you talked to Ed Gray after the December 8th

24  meeting between the three of them, that's what you're talking

25  about; right?

1 A    Yes, sir.

2 Q    Mr. Gray basically told you that there was, of course, an

3 unrecorded conversation between the two of them when Agent

4 Rogers went to the bathroom; right?

5 A    Yes.

6 Q    And are you saying that that was the point in time when

7 the defendant disclosed that he wanted a particular type of

8 shotgun, a Saiga?  Is that what you're saying?

9 A    Yes.

10 Q    Okay.

11      All right.

12      So obviously, Mr. Gray, as counsel for the government

13 acknowledges, learned that in an unrecorded conversation;

14 right?

15 A    (No response.)

16 Q    That he wanted the Saiga?

17 A    Yes.

18 Q    He learned that in an unrecorded conversation?

19 A    Yes.  Mr. Wolf told Mr. Gray that he wanted a Saiga

20 shotgun, and that conversation was not recorded, because

21 Mr. Rogers was not at the table.

22 Q    I'm sorry.  Say that again.

23 A    Mr. Wolf told Mr. Gray that he wanted a Saiga shotgun, and

24 that conversation was not recorded, because Special Agent

25 Rogers was not at the table.

1    Q    Okay.

2         So, they did have unrecorded conversations?

3    A    They had that unrecorded conversation on that day, yes.

4    Q    And it's your position, the government's position, that

5    they had no other unrecorded conversations at any time?

6    A    No.  Prior to that time, the topic of a Russian automatic

7    shotgun had not come up in any reported contacts between

8    Mr. Gray and Mr. Wolf, according to what he reported to me.

9    Q    So says Mr. Gray?

10   A    Correct.

11   Q    Mr. Wolf says otherwise; right?

12   A    That is what he testified, yes.

13   Q    Right.

14        So we have a conflict in the testimony --

15   A    Yes.

16   Q    -- between Gray and Mr. Wolf?

17   A    Correct.

18   Q    Thank you.

19             (A brief off-the-record discussion was had between

20             Mr. Whittaker and Ms. Atiyeh at counsel table.)

21             THE COURT:  Do you have additional --

22             MS. ATIYEH:  That's all we have from the witness,

23   Your Honor.

24             THE COURT:  Okay.

25        You may step down.

1              (Witness excused from the witness stand.)

2              MS. ATIYEH:  Certainly true, Your Honor, that there

3    is a contradiction between Mr. Gray and Mr. Wolf's testimony.

4    And I think it's clear from the jury's verdict that they

5    overwhelmingly credited Mr. Gray's testimony over Mr. Wolf.

6              Because what that evidence showed was that Mr. Wolf, in

7    fact, never asked for -- and what all of these conversations

8    are getting to -- never asked for this conversion from the

9    weapon -- from fully automatic to semiautomatic.  That this

10   meeting on December 18th was the first time that a shotgun was

11   ever brought up.

12             And from that point on, the conversations went to talking

13   about getting a semiautomatic and converting it to a fully

14   automatic.

15             And the reason that we know that the defendant wanted a

16   semi converted to a full auto, rather than the other way around

17   is, in part, because of his own statements.  We heard him say:

18   "Any fully auto is going to be able to handle most riot crowds

19   and cops."  And frankly, there's just nothing on the recordings

20   that suggested that he wanted the conversion to go the other

21   way; from full to semiautomatic.

22             We had Mr. Gray's testimony on recross examination where

23   Mr. Werner asked him:  "During the period leading up to you

24   showing him the video in February and March, Mr. Wolf did talk

25   to you and ask you whether or not this firearm was going to be

1  converted to semi auto; didn't he?"

2       And Mr. Gray responded:  "Not that I remember."

3       Mr. Werner asked:  "In fact, you kind of got perturbed

4  from his asking -- continuing to ask you that; didn't you?"

5       Mr. Gray responded:  "No."

6       Mr. Werner asked:  "Well, you say 'not that I remember.'

7  Is that your answer to that question?"

8       And Mr. Gray came back and said:  "He never asked me, no.

9  I will rechange that.  He never, ever asked about it being

10  semi.  He always wanted full auto from the time that he brought

11  it up to us."

12      And Mr. Werner asked:  "Except the times that he asked you

13  what was going on with the gun, and is it being switched to

14  semi auto?"

15      And Mr. Gray relied:  "That never happened, no."

16      This is the evidence that was credited by the jury.  And

17  part of the reason for that is because a full-auto-to-semi-auto

18  conversion is something that is effectively unheard of.  I

19  couldn't say personally one way or another whether this is

20  something that's impossible or that has never happened.  But

21  it's something that is exceedingly rare.  We see any number of

22  criminal cases and any number of factual cases where we talk

23  about guns being converted, and the vast, vast majority of the

24  time, when we're talking about a firearm conversion, we're

25  talking a firearm being converted from semi to full auto.

1        And this concept of a fully automatic gun being converted

2   to a semiautomatic gun, it's something that's wildly unusual;

3   that's very unlikely.  And it's the sort of thing that's so

4   unusual that if it would have happened, it would have been all

5   over these recordings.  They would have been asking for

6   clarification.  They would have been asking for additional

7   information, because it's not something that happens regularly.

8        And I think that's probably part of the reason why the

9   jury credited this testimony, is because it's, on its face,

10  somewhat incredible.

11       Mr. Wolf also testified about the barrel length of the gun

12  and claimed that he didn't know how long the barrel was, or

13  that he thought it was longer than the 18-inch, sawed-off legal

14  requirement.  But the recordings were clear and at the diner

15  before taking possession of the gun, Dirty said:  "I got the

16  barrel down to 16."

17       The court also saw the text messages where Mr. Wolf asked

18  for a mil barrel.  And in his recorded phone call from the

19  jailhouse, he told his friend a mil barrel or military barrel

20  only comes in 14 inches.

21       And it seems like there may have been confusion about what

22  exactly the length was, whether it was 14, whether it was 16, I

23  think at some point, whether it was 17, but there was never any

24  confusion that this barrel was less than 18 inches.

25       And I've gone through sort of a number of material

1  falsehoods here, but given each one of them, the government's

2  position is that the obstruction enhancement was properly

3  applied here.

4      Thank you.

5          THE COURT:  Okay.

6      Thank you.

7      Mr. Werner.

8          MR. WERNER:  Your Honor, I did -- I did lodge an

9  objection, of course, to the four-point enhancement under

10  2K(b)(6)(B) that this firearm or ammunition was used in

11  connection with or with another felony offense; he had it with

12  the intent that it would be so used.

13      In its sentencing memorandum, and I think it was quoted

14  here in front of you, Judge, the government offers a quote from

15  Wolf to the effect that "when the war starts, I would rather go

16  out and scare the living hell out of some police officers."

17      And I'm not going to engage in the speculation that the

18  government does about what kind of a war.  What war?  In fact,

19  I'm asking the question:  What war?  Well, a war that was

20  coming, he felt; a war that would be started by the government

21  against the people who complained against its corruptness.

22      But are we talking about a real declared war?  What kind

23  of a war?  And that statement is an attempt to assault?  That's

24  not an assault.  That's not intent to assault.  That's free

25  speech.  It's talk.

1        Wolf's -- the government spends an inordinate amount of

2   time buttressing his so-called intent, his intent to possess

3   this weapon with another felony offense, based upon his

4   statements in public.  They cite his dangerous character and

5   propensity for violence.  They swear that Wolf was dead set,

6   Judge, on acting.

7        By golly, he even said so.  And the government says his

8   words are reliable.  And the court should take him at his word.

9        At the same time, they're pushing for an upward departure

10  for perjury; for his telling untruths.  That he's an untruthful

11  person.  Why are his words reliable?  The government believes

12  him about some things and not about others, so they can cherry

13  pick that.

14       This automatic weapon, he testified, was intended, as

15  illegal as it was, for his own and his home's defense.  Not

16  believing that; but we'll believe he'll bomb a courthouse?  On

17  what evidence, Judge?  Did he have a bomb?  What steps did he

18  take to do that that verify the intent, they bring out, to

19  commit arson, even?

20       Twenty-five-some months of surveillance, Judge, by the

21  Federal Bureau of Investigation.  And who did Wolf specifically

22  threaten?  He didn't threaten Judge Rick West.  He didn't

23  threaten Sheriff Brian Gootkin or County Attorney Marty

24  Lambert.  There's no evidence that he made statements that he

25  was going to harm these particular people that they mentioned

1  in their sentencing memorandum.

2      And Sheriff Gootkin, he said:  "Sheriff Gootkin stays away

3  from me."  That's not a threat.  That's a threat?  It's bravado

4  talk.

5      He didn't threaten Agent Deurmeier.  You certainly would

6  have heard that if he had.  They had two face-to-face

7  interviews.  And certainly, Wolf knew he was being investigated

8  by Agent Deurmeier.  He didn't threaten him or these other

9  specific people mentioned in the government's memorandum to

10  anyone else, either.  That "this is what I'm going to do to

11  this particular person."

12      So my question is, concerning this enhancement:  Where is

13  the intent?  He talked.  It's all in his talk.  He exercised

14  his right to free speech.  He talked big.  He talked extreme.

15  He made himself sound like, and he wanted people to believe

16  that he was going to do that.  And talk is cheap.

17      I, Judge, would have at least thought, I would have at

18  least thought that he had been spotted in a prior armed

19  standoff of some type with a government official, or at least

20  he had been in some hostile encounter with a law enforcement

21  officer.  Just one occasion.  And hadn't been in any of those

22  things; nor had he ever had such an encounter.

23      What he did was he talked.  He talked on webcasts; he

24  talked to other men who he thought were of like mind who

25  happened to be undercover agents.  And they fed off each other.

1  Same happened on the webcasts.  The government mentioned that

2  Gary Hunt was on his -- was a webcast.  Now, he was extreme.  I

3  don't know how many times Wolf said in response to what Hunt

4  proclaimed:  "We have to do this by lawful means first before

5  anything like that comes about."

6      And the government knows this, they made the tapes of

7  these webcasts.

8      They treated him saying:  "I think there's a war coming.

9  And the judges and the police officers, they're not going to be

10  safe."

11      That's the talk and intent of assault?  That's the intent

12  to assault?  This gun can handle riots and law enforcement.

13  That's intent to use the weapon to kill a particular person?

14  It isn't.  It's talk.  He's still impressing everybody,

15  including Dirty.

16      Judge, William Wolf exercised his right to free speech

17  under the First Amendment in his webcasts and in his

18  conversations with people he thought were with him in some of

19  their thoughts that the government was corrupt.

20      Now, Judge, the government could pay attention to him and

21  they did.  They could be concerned, and they were.  They could

22  monitor him, and they did.  He wasn't charged with assault

23  during this time.  With intending to assault someone.  Because

24  there weren't any facts for making such a charge.

25      To aid and abet this enhancement on this gun, they talk

1   about the flamethrower.  He never had a flamethrower; he never

2   possessed one; he never had the parts to make a flamethrower.

3   There was no evidence of him assembling a flamethrower.  He

4   loved talking about them.  He was interested in them.  He was

5   interested in weaponry.  Many men are.  He never possessed one;

6   he never built one.

7       All this talk about constructing one.  Didn't happen.  No

8   witness verified that.  Ed Gray in his undercover capacity

9   snooped around his entire house on one of his unrecorded

10  visits.  Nothing.  Nothing incriminating.  So what the

11  government is doing is speculating.

12      William Wolf, Judge, as you know, is 53 years old.  Where

13  is his violent history?  Convictions?  Where is his history of

14  using weapons to injure or even threaten people?  A person?

15  There aren't.  There aren't any victims like that out there.

16      They stated and quoted that he would -- that he said that

17  he would get the sheriff to haul a judge off the bench right in

18  front of him, or if he was the sheriff, he would do so, because

19  the judge was violating his oath of office.  And the government

20  called that chilling.  Who was the judge?  Which judge?  I

21  could hear that banter by guys sitting around impressing each

22  other at McDonald's, Judge.  I can.  He's talking.

23      He's talking because he's frustrated, as are other people.

24      The government, Judge, in supporting this enhancement,

25  downplays his lack of criminal history.  But I know that they

1  would not downplay it if he had a criminal history.  And

2  especially, of violence; of assaults.

3      And of course, a person's criminal history is the way many

4  courts decide whether or not he's truly a danger and whether to

5  enhance a sentence because of it, because he's demonstrated it.

6      If not in actual convictions, then in verifiable criminal

7  acts of violence.  And my question is:  Where are they?  They

8  were not presented.

9      He, in essence, says:  Pay attention to me, everybody,

10  because I'm extreme.  I'm an extreme guy.  I'm not a nice guy.

11      The third thing here is:  Drop a bomb on the courthouse.

12  Well, as I said, Judge, you know, law enforcement can and did

13  pay attention when he said things like that.  But they didn't

14  charge him, because they couldn't charge him.  Because it

15  wasn't an assault.  It wasn't an express intent to go do that.

16      Rather, Judge, what the government is doing here, I

17  believe, is attempting to use the sentencing guidelines to

18  increase his sentence equal to or more than if they had charged

19  him.  Charge him.  Don't come in the backdoor of sentencing

20  when there isn't the evidence to charge him, let alone convict

21  him, of assaulting people or intending to assault people.

22  That's what's going on here.  And it's a misuse of the

23  sentencing guidelines.

24      If the government wants to hold him accountable for

25  intending to assault a person, or attempting to assault a

person, then they should charge him.  But they aren't in these
charges, Judge.  There weren't any state charges to that
effect.  And it's because they don't have it.  They don't have
the facts.  What they have is his talk, which bothered them;
which concerned them.  And they have the sentencing
enhancements to misuse.  They want a four-level enhancement
from the guideline, a base offense level, based upon his
demonstrated intent to assault with this weapon, and/or commit
arson or all these other crimes.  Not based upon his criminal
history, Judge.  Not based upon verifiable acts of violence
that he did.  Not based upon threats he made to specific people
or threats uttered to someone else about specific people.
But talk.

        And they even go further.  They even want an extreme --
talk about extreme, an extreme upward departure, based upon the
same thing.  The four-level enhancement isn't even warranted.

        Concerning the two-point enhancement, Judge, the jury did
not believe Wolf, and when juries convict a defendant who
testifies, it means usually they didn't believe him or they
believed someone else.

        It doesn't mean that there was perjury.  If he said he was
going to lie or that he did lie, concerning his testimony,
obviously, that's proof of perjury.  This is a fine line.  And
talk about a way to chill somebody from testifying and
exercising their constitutional right.

1    This came down to Ed Gray's word.  And Ed Gray wasn't any

2    stellar witness.  He did say first, "as far as I remember."

3    And then he caught himself saying:   "Well, I guess I better say

4    this, assert this," more strongly.

5    You may remember there were texts introduced in evidence

6    from Ed Gray to the defendant.  I have in front of me one here

7    on January the 9th that "I'm going to be in town.  I just

8    wondered if we could meet up for a minute tomorrow.  Late

9    afternoon."

10    I mean, Ed Gray and him talked a lot.  And so, it came

11    down to whether or not they talked about this gun.

12    And certainly, one -- if you want to speculate, you could

13    speculate that they certainly probably would have.  And that Ed

14    Gray was the one not being truthful.

15    Judge, I believe these enhancements are improper.  The

16    guideline range, based upon the type of weapon he bought, here

17    is the guideline range that should be applied.  An enhancement

18    or an upward departure based upon what I've described is

19    improper.

20    And I note, to buttress that, the government says that --

21    asserts that Wolf didn't respect the law.  Well, if you listen

22    to the web, he respected the Constitution a lot.  And he didn't

23    respect it as an excuse to break the law.

24    He believed, as many did, that the Constitution was being

25    trampled on by government officials.

1       The jury found he broke the law by acquiring a sawed-off

2  machine gun.  There was no finding -- they weren't asked to

3  find that he wanted this gun for any other reason other than

4  what he stated on the stand, home self-defense.  And the

5  government's speculation about his intent or what the jury must

6  have thought, doesn't hold any -- doesn't have any weight.

7  They don't know what the jury thought about specific things.

8       Judge, he'll be deterred from doing something like this

9  again.  He's been in county jail for 345 days.  That's hard

10  time for his first criminal offense.  And he's facing more.

11      He exercised his First Amendment rights, Judge.  He spoke

12  in raw terms.  The government heard what he said, decided to

13  monitor him for a long time.  Nothing happened.  They were

14  monitoring him.  No offenses.  He wasn't committing offenses.

15  He wasn't assaulting people.  He wasn't threatening assaults

16  against people.  He was railing against what he thought were

17  unconscionable acts by government officials.

18      And in the event of a war, when everything breaks loose,

19  "I need to be prepared.  So do you."  That's not assault.  It's

20  not assault.

21      But then, Judge, he made things very difficult for

22  himself, because on December 18th, he made that statement that

23  was recorded to Agent Rogers:  "Hey, see what you can do about

24  getting me a Russian automatic shotgun."

25      And that statement and what ensued, that's what he should

1  be sentenced on.  The government spent an inordinate amount of

2  time at trial, here, setting forth his talk to make the court

3  improperly enhance his sentence beyond what this case was

4  about, without ever charging him with what they now say he is

5  guilty of:  Attempting -- intending to assault people.

6      It never happened.  They know it never happened.  But this

7  is how they want to get that, almost more time for him than

8  they would have had if they would have charged him.

9      So, Judge, that's our position on these enhancements.

10          THE COURT:  Thank you.

11      Is there anything further from the government?

12          MS. ATIYEH:  Just a brief response, Your Honor.

13      Mr. Wolf talked.  He talked and he talked, and then he

14  bought a machine gun.  This guideline -- Mr. Wolf didn't commit

15  an assault.  He didn't attempt to commit an assault.  That's

16  not what this guideline is for.  What this guideline is for is

17  whether he intended to commit an assault.  The guideline in the

18  application note, I think it's Application Note 14(c),

19  specifically says:  "Regardless of whether a criminal charge

20  was brought or a conviction obtained."  That's not what's

21  relevant here.

22      What's relevant is his intent.  And his talking, his

23  speech, his free speech, tells you what his intent was.  It was

24  to kill the public officials.  That's what he said after he

25  talked and talked and then bought a machine gun.  The step he

1  took towards the assault was buying the machine gun.  That's
2  his intent, that's where we find his intent in all of this free
3  speech.

4      And Your Honor, we should credit the words, credit his
5  testimony, credit the things he said before he was facing
6  prison time.  Credit the things he said openly, the things he
7  said to Mr. Gray, and the things he said to Special Agent
8  Rogers.  That's the testimony that we should be crediting here.

9      And it's the testimony that illustrates what his intent
10 was.  And that's what the guideline is meant to address.

11     Regarding the two-point enhancement for perjury,
12 Mr. Werner said and he's right, that there is -- when a
13 defendant is convicted, there's a very fine line between
14 exercising your right to testimony -- or -- and a jury not
15 crediting you, and therefore, it being perjury.  But it's a
16 line that was crossed here.

17     Mr. Wolf's testimony was not credible.  And I went through
18 this in my previous argument about all the reasons it was not.
19 It was flatly contradicted by the other witnesses.  It wasn't a
20 mistake, it wasn't simply exercising his right to testimony.
21 It was making materially false statements to this court.  And
22 for that -- for those reasons, the obstruction enhancement
23 should be applied here.

24     That's all I have, Your Honor.

25          THE COURT:  Well, I'm going to take up the perjury

1  enhancement first.  And I think that this is a difficult
2  enhancement.  I think it's a difficult enhancement for the
3  government, to be honest with you.

4       There isn't any doubt that there was testimony by the
5  government's witnesses that was different than the testimony
6  that Mr. Wolf ultimately gave during his direct and
7  cross-examination.

8       And that the government, in addition to testimony, had
9  recordings of Mr. Wolf's own statements.

10      With regard to whether or not Mr. Wolf and Mr. Gray had
11 met on additional occasions that weren't recorded, Mr. Gray
12 denied that.  Mr. Wolf said they did.

13      Other than that conflicting testimony, there really is
14 nothing, other than the credibility of the witnesses, for the
15 court to say that was perjury.

16      For Mr. Wolf to testify that, really, what he had wanted
17 all along was an automatic shotgun converted to semiautomatic,
18 well, that wasn't borne out by the tapes, and it wasn't borne
19 out by the government's testimony.

20      But whenever a defendant chooses to exercise his right to
21 testify, it can't be shocking to anyone that his testimony
22 would be different from the testimony of the government
23 witnesses.  Is it perjury because the recordings said
24 otherwise?  Or the witnesses said that Mr. Wolf acted or talked
25 otherwise?  Maybe.  But I think it is a fine line.  And for --

1    every time a defendant exercises his right to trial and then

2    exercises his right to testify, I think it's somewhat of a

3    slippery slope to say that if his testimony really is not

4    supported by the evidence, that then he perjured himself.  I

5    know the government thinks they have a stronger case than that

6    to support that two-level enhancement.

7         But, I'm not convinced; and therefore, that objection is

8    sustained.

9         With regard to the four-level enhancement under Section

10   2K2.1 Sub (b)(6)(B), that objection is overruled.

11        The guideline does not require that these other offenses

12   for which the defendant intended the use of this fully

13   automatic shotgun actually be committed, as was pointed out by

14   the government's argument.  And what is required under the

15   guideline, and, of course, guidelines are to do that, guide a

16   court in determining what is the appropriate advisory

17   sentencing guideline for any particular offense.

18        And the guidelines talk about relevant conduct.  As we all

19   know in conspiracy cases, defendants can be held responsible

20   and accountable for actions of completely different individuals

21   under the guidelines.

22        So, it isn't that what the court considers with regard to

23   some of these enhancements that it's required that the

24   defendant actually commit the offense, that's the whole

25   relevant conduct idea.  Here, this -- with this particular

1  guideline enhancement, it's not relevant conduct in my mind.

2  It's really just looking at the facts of this case.

3  Now, the plain language of that guideline, in my view,

4  makes this enhancement apply in this case.  And that is, that

5  Mr. Wolf possessed a firearm with the intent that it would be

6  used in connection with another felony offense.

7  And we have his own words to look to in order to come to

8  the conclusion that that guideline applies.

9  Yes, the government watched and listened to Mr. Wolf for a

10  long period of time.  That's how they amassed all of these

11  statements that Mr. Wolf made that they've set forth in

12  Government's Exhibit A to its sentencing memorandum.  Maybe it

13  was talk to begin with.

14  But there's a difference between just talk and then

15  actually taking an affirmative step to acquire a weapon, such

16  as the automatic shotgun, that can carry out these offenses

17  that are described in Mr. Wolf's own statements.

18  He can't hide from his own words here.  They are his

19  words.  He didn't back down from them at trial.

20  And really, it's those words that caused him to come to

21  the attention of the United States government.  Without any

22  prodding, he suggests and requests from Dirty and Mr. Gray "see

23  what you can do about getting an automatic Russian shotgun."  A

24  weapon that Dirty testified he didn't even know existed and had

25  to look up on the Internet.

1     So, it wasn't like the weapon was suggested to Mr. Wolf.

2  Mr. Wolf asked for some assistance in acquiring one.

3     And it's no great leap at all to conclude that the reason

4  that Mr. Wolf wanted the Russian automatic shotgun was that he

5  intended to use that shotgun to carry out all of those things

6  he'd been talking about.

7     Was that his intent?  Well, if it was just talk, he

8  wouldn't have gone that extra step, in my view, to actually get

9  a weapon that he had already described as, basically, being the

10  perfect weapon to take out a crowd, that he could attach a

11  flamethrower to, all of that -- all of that stuff that he

12  talked about.  Did he do it?  No.  Thank God he was arrested as

13  soon as he took possession of the machine gun.

14     But to say that he had to be convicted of those crimes,

15  that's not what the guideline requires.  Does the guideline

16  apply if he intended to commit those crimes, which based upon

17  his own statements, he clearly did?  Yes, it does.

18     And you know, there's a lot of people who talk big.

19  There's a lot of people who are angry with the government.

20  There are people who bluster, and that's all they do.  They

21  don't take affirmative steps, then, to acquire the means by

22  which to carry out the threats that they have made.

23     Even to say:  "I just want to scare a few police

24  officers."  That's assault.  That's felony assault.  Reasonable

25  apprehension of serious bodily injury is felony assault.  And

1 | it's assault with a weapon, if you use a weapon under Montana
2 | law.  You don't have to shoot them.  You just have to scare
3 | them.  And you scare them by pointing that automatic shotgun at
4 | them.

5 | So, even if that was his intention, that fits -- that fits
6 | the enhancement.

7 | So, in my view, there's plenty here to justify the
8 | enhancement.  And therefore, the objection is overruled.  And
9 | the four-level enhancement will be applied.

10 | So, given the court's rulings on the objections, the
11 | presentence report will need to be amended.  Specifically, on
12 | page 9, paragraph 37, the adjustment for obstruction of justice
13 | will be removed.

14 | And therefore, the adjusted offense level is 22.  And the
15 | total offense level is 22.

16 | And the resulting guideline range, then, is 41 to 51
17 | months.

18 | And there are other sections that need to be corrected
19 | related to that change, I believe, also, Ms. Zink.

20 | So, paragraph 72 on page 13 needs to be amended to read
21 | that the total offense level is 22.  Guideline range is 41 to
22 | 51 months.

23 | That doesn't change the fine; does it, Ms. Zink?

24 | PROBATION OFFICER ZINK:  Your Honor, that's what I
25 | was just thinking of really quick.

1           THE COURT:  Okay.

2           (Probation Officer Zink reviewing documents.)

3           PROBATION OFFICER ZINK:  It would change it, Your

4  Honor, to seventy-five hundred to -- from seventy-five hundred

5  to 75,000.  That would be the new range.

6           THE COURT:  Okay.

7      So, then paragraph 82 on page 14 needs to be amended to

8  read that new fine range of seventy-five hundred to 75,000.

9  And I think that is all of the corrections that would have to

10  be made to the presentence report.

11      So, with those rulings and those corrections, I will

12  otherwise rely on the presentence investigation report for

13  purposes of calculating the advisory guidelines.

14      I will summarize the applicable punishments for the

15  offenses under both the United States Sentencing Guidelines and

16  the applicable statutes.

17      We have now an adjusted offense level of 22, a total

18  offense level of 22.  Mr. Wolf has zero criminal history

19  points, so his criminal history category is I.  His advisory

20  guideline range is 41 to 51 months of imprisonment.

21      He is not eligible for probation under the guidelines.  He

22  is subject to one to three years of supervised release, a fine

23  of seventy-five hundred to $75,000; and a special assessment of

24  $100.  Restitution is not applicable under the guidelines.

25      For the charges of Count One, illegal possession of a

1  machine gun, in violation of 18 United States Code Section

2  922(o), and Count Two, possession of a firearm not registered

3  in the National Firearms Registration and Transfer Record, in

4  violation of 26 United States Code Sections 5841, 5845 Sub (a),

5  5861 Sub (d) and 5971, the maximum punishment on each count is

6  ten years' imprisonment; the maximum fine on Count One is

7  $250,000; the maximum fine on Count Two is $10,000; no more

8  than three years of supervised release on each count; and the

9  $100 special assessment on each count.

10       Under the statute, Mr. Wolf is eligible for probation for

11  a period of one to five years.  And again, the restitution is

12  not applicable.

13       So, do you agree, Mr. Whittaker, that that's an accurate

14  statement of the statutory and guideline provisions, given my

15  rulings?

16            MR. WHITTAKER:  Yes, Your Honor.

17            THE COURT:  Do you also agree, Mr. Werner?

18            MR. WERNER:  Given your ruling, Your Honor, it

19  appears that you have calculated that correctly.

20            THE COURT:  Okay.

21       And there was a forfeiture claim in the indictment.  What

22  is the status of that claim, Mr. Whittaker?

23            MR. WHITTAKER:  Your Honor, I guess I need to check

24  on the publication.  We'll file the necessary paperwork.  I'm

25  not sure if the publication period has run on that.

1          THE COURT:  I didn't notice a preliminary order of

2     forfeiture.  But, with this kind of gun, can you -- I mean, is

3     it automatic that ATF takes it, since it's illegal, or not?

4          MR. WHITTAKER:  No.  We need to dismiss the

5     forfeiture count, because the FBI has taken care of that

6     administratively, it's my understanding.  Is that correct?

7          AGENT DEURMEIER:  That's correct.

8          MR. WHITTAKER:  I was confusing that with a different

9     case.  I'm sorry.  It's been taken care of.  We need to dismiss

10    the forfeiture count.

11          THE COURT:  Okay.

12       Forfeiture count is dismissed.

13       Okay.

14       Mr. Whittaker, you may make your sentencing argument at

15    this time.

16          MR. WHITTAKER:  Your Honor, I've practiced in this

17    court now for a few number of years in front of Your Honor, and

18    I hope that Your Honor knows and understands that I try to be

19    reasonable and thoughtful about the sentences that I recommend

20    to the court.

21       And so it's not lost on me the fact that the government is

22    asking for a hundred-and-twenty-month sentence here, an upward

23    variance from the guideline calculation, even as the court has

24    amended the calculation.  We would still ask for a sentence of

25    a hundred and twenty months.

1    And if I might just give a few of the reasons why we

2  believe a hundred and twenty months is necessary; it's

3  reasonable; it's not greater than necessary.  I want to start

4  with Mr. Wolf's history and characteristics.  And Mr. Werner

5  touched on this, and, of course, we addressed this in our

6  sentencing memo, that Mr. Wolf has no criminal history.  And I

7  recognize that, Your Honor.

8    We recognize he has no criminal history.  And I think the

9  court knows from my practice in this court, that the criminal

10 history is important.  But it's not the end all, be all.

11   I stood here last week, Your Honor, with a defendant that

12 had 28 criminal history points.  I did not ask for an upward

13 variance, because of the other factors in the case.  And that's

14 what I ask the court to look at and I believe outweighs the

15 fact that Mr. Wolf has no criminal history in this case.

16   In this case, the criminal history does not capture the

17 true risk that Mr. Wolf poses to society.  It's not a good

18 indicator.

19   In this case, this was an escalating case.  Mr. Wolf did

20 talk for a long time.  And Mr. Werner's right, that the talking

21 is not necessarily a crime.  But it escalated.  Mr. Wolf said,

22 in his own words, the time for talking was over.  And then he

23 moved forward to acquire a fully automatic shotgun.

24   And as Your Honor knows, I think all of us in this

25 courtroom know, many of the mass shootings that have been in

1  the news in the recent months and years, were committed by

2  people with no criminal history.  That criminal history does

3  not always predict how a defendant will act.

4      In this case, I suggest that Mr. Wolf's characteristics

5  and his words and his talking, are what gives the court an

6  indication of how he was going to act, and how he will act.  He

7  was a self-proclaimed extremist.  He was moving forward in his

8  own extreme movement.  He sought out, in his own words, the

9  most devastating weapon he could find.  He was building up to

10  something big.

11      And Your Honor, I think if you'll remember, the video

12  where Ed Gray showed Mr. Wolf Dirty firing the machine gun.

13  And Dirty put two rounds -- not two rounds, two clips through

14  the gun.  And he shot at that plywood.  And Dirty made the

15  comment that "body armor is not going to help when you look at

16  that plywood," and Mr. Wolf is heard on the recording laughing.

17  And then you hear him laughing again, and he says:  "That's why

18  I wanted it."

19      Excited.  He was thrilled that he would get to use the

20  full capabilities of that dangerous weapon against someone

21  wearing body armor.

22      That's what he wanted it for.  He wanted to kill cops

23  that were wearing body armor.

24      And then he talks about, Your Honor, not only -- right

25  after that -- after he's laughing about getting that gun, he

1 | talks about attaching the flamethrower to the gun, and if that
2 | machine gun didn't kill them, he was going to kill them with a
3 | flamethrower; light them on fire.  And he makes the sound of
4 | it.  Remember that?  The whoosh.  You hear him describe how
5 | it's going to sound.  And he's excited about this.

6 | He also talks about the way he's going to load the rounds
7 | in that gun.  He talks about how he's going to start with
8 | buck-and-ball, and then eventually move to incendiary rounds,
9 | to light the Kevlar on fire and watch them burn.

10 | That's why he wanted it.  That's what he said.  "That's
11 | why I wanted it."  And are those statements reliable?
12 | Mr. Werner suggests that there's some conflict in the
13 | government's position about whether we should believe Mr. Wolf
14 | or not.  There's not.  We say:  Believe Mr. Wolf's intent when
15 | he's talking to whom he believes are his co-conspirators.
16 | Those are the reliable statements.  That's what he wanted it
17 | for.

18 | That's his true intent.

19 | Mr. Wolf tries to explain a couple of those statements,
20 | and he tried to do that at trial.  There was the one statement
21 | that he made where he wanted it to clean house with.  Your
22 | Honor will remember that.

23 | Now, he tried to claim:  Well, that was just for home
24 | defense.  Well, even his trial testimony was contradictory to
25 | that.  He said he wanted it to, quote:  "Go out and scare the

1   living hell out of some police officers."  That doesn't sound
2   to me like he's going to use it at his house.  He's going to go
3   out and scare the living hell out of police officers.  That
4   weapon is not for home defense.

5        And then he claims that the "clean the streets" comment
6   that he made just had double meaning.  But I ask you about
7   those pathetic attempts to explain those things away, are they
8   consistent with the many other violent acts that he described
9   and he espouses?

10       What about the statement where he talked about taking the
11  ammo off the dead bodies?  Did he expect to have a bunch of
12  dead bodies stacked up at his house for home defense?  No.

13       What about the judges being the targets.  Did he expect a
14  bunch of judges to show up at his house who he would need a
15  shotgun to protect himself from?

16       What about the statement:  "Any fully automatic shotgun is
17  going to handle most riot crowds and cops"?  Did he expect to
18  have a riot crowd at his home, which was way back up in the
19  woods?

20       What about the comment:  "Start shooting them at three to
21  400 yards"?  That's how you'd go gopher hunting.  Is that home
22  defense?  No.

23       What about the statement:  "The first few politicians and
24  judges that have their heads blown off, the rest of them are
25  going to go into hiding"?  Did he expect that a bunch of

1  politicians and judges were going to show up at his house and

2  he was going to need to blow their head off at his home?  No.

3      The shotgun was for affirmative use.  It was to kill

4  public officials.  And that's what he said he wanted it for.

5  He took the step of moving forward to acquire it.  He wanted to

6  do the most damage possible.  And at trial, he didn't back down

7  from this.  He said he wanted to, quote:  "Get the problem done

8  fast."

9      What about dropping 500 pounds of napalm through the roof

10  of the courthouse?  That certainly wasn't going to happen at

11  his home.  And roasting the Bear Cat with a flamethrower like

12  an Easy Bake oven.  That wasn't going to happen at his home,

13  either.

14      I suggest, Your Honor, that Mr. Wolf has a very dangerous

15  character that -- that demonstrates the need for an upward

16  variance here.

17      Now, if I might address the nature and circumstances of

18  this offense, Mr. Wolf's comment about being extreme, I think

19  this is an extreme gun case, Your Honor.  I've prosecuted a lot

20  of gun cases in my nine-plus years as a prosecutor.  And I've

21  never seen a gun case like this one.  I've never seen a gun

22  case that section 2K2.1 doesn't have the ability to capture the

23  full extent and nature of the circumstances of this offense.

24  Section 2K2.1 is generally used -- we see it most often in

25  cases of a felon in possession of a firearm, where we have a

1  drug dealer trying to protect his stash, or something like
2  that.  We sometimes even see cases where it's just a hunting
3  rifle.  I've had cases in this court like that, where they were
4  going to go hunting; hunting for deer or elk.  Not for people.
5       The court has already highlighted in this hearing that
6  Special Agent Greg Rogers, who has 25-plus years as a special
7  agent, and I think he said 20-plus years as an undercover
8  agent, has investigated, as he described, very dangerous
9  drug-trafficking organizations, and other types of militia-type
10  extremists like Mr. Wolf.  Agent Rogers had never even heard of
11  this kind of gun.  He didn't know if this kind of gun even
12  existed.  He had to go back and look it up on the Internet.
13       He also testified, Agent Rogers, in his experience, he had
14  never had an individual so eager and willing and ready to move
15  forward and ready to acquire that type of dangerous weapon.
16  Within the first couple of meetings, Mr. Wolf was already
17  asking for this kind of thing in moving forward in his plan.
18       Agent Rogers testified that if anything like that happens,
19  it generally takes quite a while to lead up to something like
20  that, when he's involved as an undercover agent.
21       Now, does 2K2.1 address all the characteristics of this
22  firearm?  And I suggest that it does not.  This is one of the
23  most dangerous weapons that Mr. Wolf could get his hands on.
24  It had multiple illegal characteristics, and I highlighted this
25  in our sentencing memo, that, yes, it takes into account the

1 fact that it was a machine gun.  But it does not take into
2 account that it had an additional illegal capability, of that
3 being a sawed-off shotgun.

4     Nor does it take into account that Mr. Wolf wanted to
5 attach a flamethrower to it.

6     For those reasons, and I gave some examples of -- tried to
7 make some analogy with maybe an obliterated serial number.  I
8 also indicated that sometimes an upward departure under the
9 guidelines is suggested when a weapon is dangerous, extremely
10 dangerous.

11     And so I would suggest that we don't have to adjust the
12 guidelines here, but that that needs to be taken into account
13 under 3553(a), under the nature and circumstances of the
14 offense.

15     And then, I also indicated in my sentencing memo, Your
16 Honor, that this case is one where we have official victims, or
17 that was the intent.  The intent of Mr. Wolf was to kill public
18 officials.  He said it right before he took possession of the
19 gun.  And then after he took possession of the gun, he said he
20 needed to kill the head of the snake.

21     And that one statement by itself doesn't necessarily say
22 anything.  But when you look at the context of what he's
23 talking about, the conversation he just had about his
24 animosity, his hatred, whatever, for the government; local,
25 state, federal.  That's what he's talking about.  And he makes

1  that statement in here right before taking possession of the
2  gun.  Mr. Wolf says:  "Well, once again, the concept is whole.
3  You don't have to take over the town.  All you got to do is
4  kill the government."
5      Agent Rogers:  "Right."
6      Wolf:  "And I guarantee you, the first few politicians and
7  judges that have their heads blown off -- yeah -- the rest of
8  them are going to go into hiding.  If they don't go into hiding
9  -- if they go into hiding, they can't do shit."
10     Agent Rogers:  "Right."
11     Wolf:  "Ah --"
12     Agent Rogers:  "They can't sit around and, ah, sign shit
13  and make it --"
14     Wolf:  "What -- what like-minded sheriff or police is
15  going to go out and uphold the law when he knows he could get
16  his head blown off?"
17     So when he says right after he takes possession of the
18  gun:  "I'm going to kill the head of the snake," we know what
19  he's talking about.  He reaffirms his intent to use this
20  dangerous weapon to kill public officials.
21     So, when the guidelines suggest a six-level enhancement
22  for official victims, and I would suggest that the guidelines
23  put a significant weight on protecting those public officials,
24  those official victims, and that needs to be taken into account
25  here.  And it's not taken into account under 2K2.1 as the

1  guidelines are currently calculated.

2  One of the factors under 3553(a) is protection of the

3  public.  Mr. Wolf says:  "I don't believe in anything that's

4  not extreme."  When he talks about that, he's talking about in

5  the context of dropping 500 pounds of napalm through the roof

6  of the Gallatin County Courthouse and roasting marshmallows on

7  it.  He says his extreme movement is "wiping that place out and

8  then move to the next building."

9  And then when those people at that committee of safety

10  meeting try to talk him down a little bit, Your Honor, you

11  heard it on the recordings that we played for the jury at

12  trial, he says:  "That's -- that's the problem between you and

13  me."  He says:  "When you fail," and they're talking about

14  maybe we should try to do things more lawfully, maybe we should

15  file some paperwork, whatever, he says:  "When you fail, I will

16  succeed" in his extreme movement.  He's trying to convince them

17  how committed he is.

18  And then he says to them, too, right around that same time

19  during the recording:  "I'm not the good person people think I

20  am."

21  Your Honor, is there a need to protect the public in this

22  case?  There is a huge need to protect the public in this case.

23  The Department of Justice as a whole, the FBI, the U.S.

24  Attorney's Office, all of us here today, believe that Mr. Wolf

25  poses a very large and extreme danger to the public.

1    We believe you should take him at his word when he says
2    that he's going to do these things.  This one factor alone
3    under 3553(a) justifies a sentence of a hundred and twenty
4    months.

5    The local law enforcement officers have indicated to Agent
6    Deurmeier, in this time that Mr. Wolf has been in custody, how
7    relieved they are that they don't have to look over their
8    shoulders, because he's been incarcerated for the last year.

9    There is a great need to protect the public.

10   One of the factors under 3553(a) is deterrence.  Your
11   Honor, Mr. Wolf has been in custody now for almost a year.  I
12   think the presentence report says 345 days.  And I suggest that
13   there's been no change of attitude; no backing down from where
14   he was before he was arrested.

15   We attached to our sentencing memo one of the letters he
16   wrote to Mr. Gary Hunt, who Mr. Werner called extreme, and we
17   agree with that position, Gary Hunt is extreme.

18   But it's a letter, as you read it, there's no remorse,
19   there's no contrition, there's no, "hey, I feel bad about
20   this."  You know -- anyway there's nothing in there that
21   suggests that he's had a change.

22   And a sentence, at least according to the defendant's
23   sentencing memo of 27 to 33 months, we believe is not even
24   anywhere near sufficient to promote the need for deterrence,
25   both specific to Mr. Wolf and to other like-minded people like

1  Mr. Hunt, or others, that may be inclined to carry forward

2  violent acts like this, because of their political motives.

3      What type of sentences are available here, Your Honor?

4  Well, we're asking for a hundred and twenty months.  We're not

5  asking for 240.  And certainly, that's an available sentence to

6  the court in this case.  You could run both counts consecutive.

7      We're not asking for that.

8      In my talk with colleagues and things as we were

9  discussing this case, one of them said:  "Well, if we're going

10  to ask for a hundred and twenty months, what do we do with

11  somebody else who has a higher criminal history than Mr. Wolf,

12  if you're asking for the statutory maximum?"

13      Well, my response to that is that we're not asking for the

14  maximum here.  There's 240 months available.

15      But what we're asking for is a sentence that will protect

16  the public.  There's these other factors that weigh into the

17  need for that hundred-and-twenty-month sentence.

18      That's why we're considering them all together as a whole.

19  And had Mr. Wolf taken another step, this guideline calculation

20  would have been wholly different.  In fact, as the draft

21  presentence report went through the process, Your Honor, there

22  was a calculation that came out much, much higher, because it

23  was close to whether he'd gone forward with an attempt to do

24  these other things.

25      We ultimately agreed that the law did not allow -- show

1  that there was an attempt.  But had there been an attempt; had
2  Mr. Wolf taken another step, not been arrested immediately upon
3  taking possession of that gun, this would have been a totally
4  different guideline calculation.

5      And so my response to that question of "what do we do with
6  somebody who's done more?"  Well, the guidelines do account for
7  that when they do more.  The guidelines provide for that.

8      It's a complicated calculation, but you go to 2X1.1 and it
9  takes you back to the underlying assault or homicide provisions
10 under the guidelines.

11     So if Mr. Wolf had gone further, this would be a different
12 guideline calculation, and we may be asking for more than a
13 hundred and twenty months.

14     The last factor I want to address, Your Honor, is to
15 promote respect for the law.  And I would suggest that Mr. Wolf
16 has no respect for the law.  As I questioned him on
17 cross-examination, it was his own interpretation of the law.
18 And we kind of went back and forth a little bit about that.

19     About, you know, he went to the UN, went to the Attorney
20 General, he went to the FBI, went to marshals, went to several
21 different places to try to get people to help him.  And they
22 told him that what he wanted to do was not within the bounds of
23 the law.

24     But he said that he interprets the law based upon -- he
25 does things based upon his own interpretation of the law.  And

1  people come to him for interpretation of the law, and he seems

2  to think that he can use the Constitution or various other laws

3  to justify his motives.  And when they don't agree with him,

4  then that seems to make him angry, and he's going to acquire a

5  fully automatic shotgun and take matters into his own hands and

6  kill the head of the snake, hoping that will do away with the

7  problem.

8       Your Honor, I guess I'll end there.  But I would urge the

9  court to sentence Mr. Wolf to a hundred and twenty months.  We

10  believe that a hundred and twenty months is necessary to

11  protect the public, to serve the ends justice in this case.  I

12  realize a lot of this is talk.  But it gives you his clear

13  intent.  It tells you what he's going to do.  And the court is

14  in a position where it has to try to make that determination.

15  Is it safe to send Mr. Wolf out onto the streets, given what he

16  said he's going to do?  I submit that it's not.

17       Thank you, Your Honor.

18            THE COURT:  Mr. Werner.

19            MR. WERNER:  Not every gun case, Your Honor -- in not

20  every gun case, in not so many gun cases, that four-point

21  enhancement is applied.

22       And that's significant here, Judge.  And my arguments

23  concerning that this was about his intent, I maintain those.

24       The enhancement, the 41 to 51 months, to say that's not

25  going to deter someone is -- goes against common sense.  This

1 is a man who's never committed an offense before in his life.

2     That's not going to deter him?  Of course, it's going to

3 deter him.

4     And if the government thinks this is such an extreme case,

5 that enhancement is pretty extreme.  So that has penalized him

6 plenty.  And it's penalized him enough.

7     And the government goes on to conflate these various acts,

8 things he said, like, well, he's not going to shoot somebody at

9 300 yards -- and he's going to shoot somebody at 300 yards.

10 Well, he's not going to do any of that with these shotguns,

11 either.  He's not going to do all these things that they're

12 saying with this particular shotgun.

13     He thought a conflict was coming, and he wanted to be

14 ready.  And that's it.

15     There is not evidence of intent beyond his talk, his

16 bluster, and his blather.  There isn't.  And the judge -- the

17 court -- you credited him with his words hurting him.  So that

18 that enhancement should sting him.  And that's where it should

19 stay.  That's where it should end.

20     This is a guideline upward departure of twice -- more than

21 twice what the guideline range is.

22     That's extreme.  That doesn't match what the facts are

23 here.  Especially when, I will repeat:  There is simply no

24 history of his demonstrated acts of violence.  There aren't.

25 And yes, he talked.  And he talked.  And he's been penalized

1   for that talk.  But he's being penalized enough.

2       The conflation continues.  Well, he was going to -- oh, he

3   had the intent to attach that flame- -- my gosh, he was so

4   taken with Greg Rogers, he would have said anything to that guy

5   to impress him.

6       He was talking.  He never had any flamethrower, any

7   capability of even doing anything like that.  But all these

8   things the government just likes to keep snowballing and

9   snowballing and snowballing and playing on fears and -- you

10  know what?  The concerns there, Judge, the sentencing guideline

11  range is going to serve every purpose of the sentencing act.

12      And yes, at trial, he said:  "I didn't do this."  And so,

13  well, I don't know, that's why you have a trial.  I don't know

14  what the government expects William Wolf to do.  When one

15  person thinks they're not guilty of this, and the government

16  does.  And usually, in a case like that when they go to trial,

17  there's not like there's a lot of apologies afterwards.  And

18  yes, he has the same sentiments in terms of his guilt, which

19  does not say that he had the intent to do what the government

20  says that he had the intent -- intent to do what he was going

21  to do.

22      And the court was right.  He didn't commit any assaults.

23  But that's not the point.  But the point is he didn't have the

24  intent to do that, either.  Not just by talking.

25      Forty-one to 51 months, Your Honor, penalizes him heavily

1 from what the guideline range should have been.  And it's

2 penalized him for the talk and for the intent that the court

3 thought he had.

4     So, to then pile on top of this, such an extreme

5 enhancement would be improper.  And I'm asking the court not to

6 do that.

7     Thank you.

8         THE COURT:  Mr. Wolf, do you have anything you wish

9 to say before I impose sentence?

10         THE DEFENDANT:  Yes, ma'am, I do.

11     Do I say it here or step up to the podium?

12         THE COURT:  You can say it right there, please.

13         THE DEFENDANT:  Thank you, ma'am.

14     I want you to please listen very carefully to what I say.

15     The trial of William Krisstofer Wolf has culminated in two

16 facts:  The paid informant, Ed Gray's, testimony and

17 infringement on free speech and fair impartial trial.

18     On December 18th, 2014, in a debriefing of a recorded

19 meeting in Four Corners, Montana, the paid informant, Ed Gray,

20 made the statement that I wanted, quote, "a Russian fully

21 automatic shotgun."  Specifically, a Saiga.  That recorded

22 meeting by FBI agent Greg Rogers as entered into evidence, has

23 no such statement.

24     In 22 months of FBI recorded statements, I only ever

25 request a, quote, "Russian automatic shotgun."

1    This is not an illegal request.  If it were, the Model

2  1911, .45 ACP, the old Army .45, would be illegal, because the

3  letters A-C-P stand for automatic Colt pistol, which is not

4  fully automatic.  It is still used today.  And sold, along with

5  the Ruger automatic, Sig Sauer automatic, and Kimber automatic.

6    However, in those 22 months of FBI recorded conversations

7  and meetings, there is never, never a mention of a Russian --

8  a, quote, "Russian fully automatic shotgun, specifically, a

9  Saiga."

10    Therefore, the statement made by Ed Gray in the debriefing

11  on December 18, 2014, as referenced by the prosecution today,

12  can only result in one conclusion:  Ed Gray and I had

13  unrecorded deal-defining conversations, as I never mention a

14  Russian Saiga fully automatic shotgun.

15    This FBI evidence -- this is not my evidence, this is the

16  FBI's own documentation -- is supported by telephonic records,

17  I asked my defense team to subpoena, that would provide there

18  were unrecorded conversations.

19    However, Ed Gray on the stand, under oath, testified that

20  there were no -- repeat -- no unrecorded conversations or

21  meetings.

22    Ed Gray testified that on December 18th, 2014, I told he

23  and Agent Rogers I wanted the Russian Saiga fully automatic

24  shotgun.

25    The recording proves that testimony and the statement on

1  December 18th, 2014, debriefing, to be a direct lie under oath.

2       An unrecorded deal-defining conversation violates the

3  wiretap rules.

4       The prevailing reason for my conviction is based on the

5  verifiable, undisputed, recorded perjurious testimony and

6  debriefing statement by Ed Gray, which is paramount to

7  derivative entrapment.  This renders Ed Gray's testimony

8  uncredible (sic) and inadmissible.

9       To cover for this uncredible (sic) testimony and

10 debriefing of Ed Gray, the Department of Justice repeatedly

11 presented testimony and evidence to establish a proclivity

12 toward my bad character.  However, the FBI documents and

13 recordings clearly show that I had no proclivity or

14 predisposition to commit a crime.  As a matter of FBI

15 documented and recorded fact, it clearly shows the FBI, through

16 various informants, attempted to induce me into committing

17 crimes of manufacturing/distributing grenades, rocket

18 propellants, RPGs, and explosives, as well as helping an FBI

19 informant acquire a model -- a Glock Model 18, P18, fully

20 automatic pistol.

21      I responded on an FBI audio recording:  There was no need

22 for a fully automatic weapon.

23      This recorded statement establishes two things:  One, I

24 know the difference between a fully automatic and an automatic.

25 Secondly, it clearly establishes that I had no proclivity or

1  predisposition to purchase and/or commit an illegal act of
2  owning a fully automatic firearm.

3      This harmful error occurred with repeated inclusion of
4  testimony and evidence by the Department of Justice, ultimately
5  exposing the jury to evidence that was persuasive, but
6  inadmissible, that it so aroused the emotions of the jury that
7  a calm and logical reasoning was abandoned; creating a biased
8  and a prejudicial jury, thereby denying me a
9  constitutionally-protected fair and impartial trial.

10      This immaterial, irrelevant, and harmful evidence and
11  testimony created undue prejudice, which caused my defense team
12  to spend over 500 hours trying to review for my defense.
13  However, this harmful, immaterial, and irrelevant testimony
14  attacking my freedom of speech, expression, assembly with
15  like-minded people, and my freedom of the press and my right to
16  redress grievances without interference, infringement, or
17  restriction by the government or government intervention is
18  protected by Article 1 of the Bill of Rights.

19      Yet, the agencies of the federal government did exactly
20  that, as testified to by FBI Agent Matt Deurmeier's 25-month
21  investigation and subsequent Department of Justice introduction
22  of my political views on government corruption.  Specifically,
23  abuse of power, judicial and political misconduct, items that
24  are not illegal to own or the historical or potential current
25  or future or open discussion, namely a flamethrower.

My very lawful and constitutional redresses of grievances and my views and opinions of current political, futuristic patriotic events.

These protected rights are not derived from recent groups like Black Panthers chanting "pigs in blanket; fry them like bacon," which is a direct reference to flamethrowers and their hypothetical use; or Black Lives Matter, who said:  "If you don't start holding yourself accountable, more like this will happen," in response to the execution-style murder of a sheriff; or Louis Farrakhan calling for 10,000 young men to do what is necessary.  Or even the Reverend Al Sharpton leading a chant in Ferguson, Missouri, of:  "What do we want?  Dead cops.  When do we want it?  Now."  Who then gets invited to the White House for dinner.

These protective rights are derived from the founding documents.  In every stage of these oppressions, we have petitioned for redress in the most humble terms.  Our repeated petitions have been answered by repeated injury.  We have warned them from time to time of attempts by their legislature to extend an unwarrantable jurisdiction over us.  That whenever any form of government becomes destructive of these ends, it is the right of the people to alter or to abolish it, and to institute new government.

But when a long train of abuse and usurpations, pursuing invariably the same object, evinces a design to reduce them to

1   utter despotism.  It is their right; it is their duty to throw

2   off such government and provide new guards for their future.

3   Blacks Law is very clear on a right where a corresponding duty

4   is invoked.

5        All the exercise of my free speech that the Department of

6   Justice used against me to prejudice the jury is derived from

7   that founding document, unanimously declared July 4th, 1776.

8   It is the Declaration of Independence, and it is the bedrock of

9   America.  You may not like what I have to say, but it is my

10  protected right and shall not be infringed.  To inflict further

11  punishment upon me for exercising my rights is double jeopardy

12  and violates Article 8 of the Bill of Rights of excessive fines

13  and penalties.

14       The use of this inflammatory, irrelevant, and immaterial

15  testimony, along with the fact that Agent Greg Rogers, as

16  recorded by the FBI, never verbally expressed that the firearm

17  he was selling was fully automatic, and that only inferred that

18  a fully automatic was illegal.

19       In fact, he went to the extreme of invoking that the

20  firearm was legally converted, not inverted, as testified to by

21  the federal gunsmith, makes his actions entrapment by estoppel.

22       Thereby, resulting in illegal arrest.  That in turn

23  resulted in a prejudicial and impartial jury.  The facts as

24  evident in this FBI document, along with many others my defense

25  team could not bring forth, due to 500-plus hours spent trying

1   to prepare a defense against irrelevant, immaterial, and

2   harmful and ultimately prejudicial testimony, as well as proven

3   lies under oath by Ed Gray, deprived me of a

4   constitutionally-protected right to a fair and impartial trial.

5        This obvious harmful error can and should be corrected by

6   this court this very instant, in compliance with its oath to

7   protect and defend and uphold the Constitution as affirmed in

8   the 1803 Marbury versus Madison ruling, and not passed over

9   ultimately turning this into a manifested constitutional error

10  to a higher court.

11       May I have that paper please real quick.  This is the last

12  part I will say.

13       I quote the United States versus Dunnigan, as per the page

14  11 of the sentencing memo:  "A witness testifying under oath or

15  affirmation commits perjury if he gains false testimony -- if

16  he gives false testimony concerning material matter with

17  willful intent to provide false testimony rather than a result

18  of confusion, mistake, or faulty memory."

19       Page 15 of the same memorandum, lines 12 through -- 11

20  through 12, quote:  "Wolf's stories about the meetings and the

21  discussions regarding the topics of a shotgun came down to Ed

22  Gray's word against -- came down to Wolf's words against Ed

23  Gray."  End quote.  Bryan Whittaker.

24       Lines 16 through 19 of that same page, 15:  "The jury

25  instead gave full credit to Ed Gray's testimony.  Wolf never

1   asked for a semiautomatic firearm, or had these alleged

2   additional meetings, conversations with Gray."  Another quote

3   by Bryan Whittaker.

4        The 12/18/2014 FBI recording states only, quote:  "A

5   Russian fully automatic shotgun."

6        Ed Gray's sworn debriefing on 12/18/2014, less than 15

7   minutes after the recording, states I asked for, quote:  "A

8   Russian fully automatic shotgun, specifically a Saiga."  End

9   quote.

10        There is no recording of this anywhere, on or before

11   12/18/2014.  Because he said "specifically, a Saiga," quote,

12   "this is not a, quote, confusion, mistake, or faulty memory."

13   Therefore, Ed Gray's testimony is perjury as defined by the

14   United States versus Dunnigan.

15        This statement is supported by nine -- please hear me --

16   nine FBI documents and recordings.  Specifically lines -- page

17   13, line 17 through 20; page 14, line 7 through 6, the

18   cross-examination; discovery page 142, which is the December

19   18th, 2014, debriefing; the December 18th, 2014, audio

20   recording; USA's -- O zero zero zero one two nine of the

21   discovery; text message on 2014; text message on -- on -- text

22   message on December 10th, 2014; text message on March 2nd,

23   2015; text message on November 25th, which supports my

24   statement on page 12, line 15; and text for a meeting and a

25   phone call on January 9th, 2015.

1    How many more does this court need to prove there were

2   unrecorded meetings and deal-defining conversations by Ed Gray

3   and myself?  We currently have nine based solely on the FBI

4   facts, documents, and recordings.

5    On page 19, line 6, I quote Bryan Whittaker saying:  "Wolf

6   asked him for a fully automatic shotgun."  Speaking by Agent

7   Roger.

8    There is no reporting of me asking for a, quote, "fully

9   automatic shotgun."

10    Thereby, making Agent Rogers's testimony, as defined by

11   the United States versus Dunnigan, perjury also.

12    I unequivocally declare my innocence in this matter, and

13   continue to maintain I was entrapped and ultimately denied a

14   fair and impartial trial amounting to political persecution.

15   The fact that there is no statement of me asking for a fully

16   automatic shotgun, but there are two recorded statements of me

17   asking for a Russian automatic shotgun, which is not a fully

18   automatic weapon, clearly indicates that there were

19   conversations between Ed Gray and myself that define the

20   parameters and the deal of this weapon.  And Ed Gray sat on

21   that stand and perjured himself repeatedly, saying there was no

22   deal-defining conversations concerning a shotgun.

23    That flag behind you, Your Honor, stands for liberty and

24   justice.  And that's what I'm asking this court to consider.

25   Today -- I did talk.  I did make the statements.  I have never

1   once denied I made those statements.

2       But if the people like the Black Panthers, or Black Lives

3   Matter, or Louis Farrakhan, or Al Sharpton, who gets invited to

4   the White House, can make those exact same statements and not

5   be pursued by the FBI, what right do I have to be severely

6   punished for using the same statements?  I asked for a Russian

7   automatic shotgun, which is not an illegal weapon to own.

8       Federal Agent Deurmeier, in conjunction with Ed Gray, said

9   that I wanted a fully automatic shotgun, yet there is no

10  recording.  And I ask you to please take that into

11  consideration in your sentencing.  And understand that I will

12  be exercising my appellate right with every chance I get.  But

13  today, you have the chance to tell the federal government you

14  will not attack somebody's freedom of speech.  You will not put

15  them in double jeopardy, or subject them to unusual fines and

16  penalties, as Article 8 declares, which is what the government

17  is asking this court to do.

18      I have not backed down, and I have not shown remorse,

19  because I did not ask for an illegal weapon.  The documents and

20  recordings clearly prove that.

21      I do appreciate this chance to speak, Your Honor.

22      Thank you.

23          THE COURT:  The question before the court today is

24  what is a sufficient but not greater than necessary sentence

25  that will accomplish the purposes of sentencing, which include

1    the need for the sentence to reflect the seriousness of the

2    crime, to promote respect for the law, and to provide just

3    punishment for the offense.

4         The sentence should also deter criminal conduct, protect

5    the public from future crime by the defendant, and promote his

6    rehabilitation.

7         In determining what is a sufficient but not greater than

8    necessary sentence, in addition to the advisory sentencing

9    guideline range, the court must consider the sentencing factors

10   set forth in 18 United States Code Section 3553(a).

11        And despite your protests that you did not want a fully

12   automatic weapon, Mr. Wolf, you can't get around the video of

13   Dirty firing that weapon, wherein it is clearly demonstrated

14   that that weapon is fully automatic.  He runs two clips through

15   it.  And he does that in a matter of -- was it 1.9 seconds, I

16   think?  And he comments about that on the video.

17        Again, you watched the video with Mr. Gray.  So you know

18   from that video that the weapon that Mr. -- that Dirty was

19   providing to you, at your request, was a fully automatic

20   weapon.  Dirty says:  "You know, our body armor isn't going to

21   count."  And you say:  "That's why I wanted it."

22        Your statements today that you did not want a fully

23   automatic weapon are not supported by the evidence, in my view,

24   Mr. Wolf.

25        And I saw that video.  The jury saw the video.  I heard

1   the comments made by you and Dirty, as did the jury.

2       Now, considering the 3553(a) factors, the nature and

3   circumstances of this offense are very serious.

4       Now, simply looking at the charge itself, possession of a

5   machine gun, that can -- that charge can cover quite a wide

6   range of factual scenarios.  It could be that an individual

7   just wanted to have a machine gun, because he thinks they're

8   cool.

9       That's illegal.  He would be prosecuted.

10      And you have a right to free speech.  But you don't have a

11  right to speak as you did, and then take actions to carry those

12  statements out.

13      And we all have a right to free speech.  But we're all

14  responsible for what we say.  And you've never denied that you

15  said the things that are set forth in the Government's

16  Exhibit A.

17      And your rhetoric, as set forth in that exhibit, is really

18  quite shocking in the level of violence that you espouse

19  against law enforcement and other government officials.

20      This isn't simply a case of you illegally possessing a

21  machine gun.  It is a case where your statements are part of

22  the res gestae, if you will, the totality of the circumstances

23  of these two offenses.  And the court must consider those.  And

24  has considered those in overruling your objection to the

25  four-level enhancement under 2K2.1, I think it's (6) -- (6)(B).

1    Is that enhancement enough?  You don't have any criminal

2    history, it's true, Mr. Wolf.  And certainly, looking at your

3    history and characteristics is something that the court is

4    required to do in, again, trying to determine what is a

5    sufficient but not greater than necessary sentence.

6    Whether or not you have just come to this point in your

7    life over the last few years that have -- that has caused you

8    to become so angry and so disenchanted with the government;

9    that before, you had a respect for the law, but now, you do

10   not, I don't know.

11   Could you, would you, did you intend to carry out the acts

12   that you vocalized so frequently?

13   Well, I think it's hard to look into a crystal ball and

14   know.  But I think, as I stated in overruling that objection,

15   that your actions certainly demonstrate that you were willing

16   to go forward in an affirmative way in order to acquire a very,

17   very deadly, dangerous weapon.

18   And your purpose for acquiring it was to carry out the

19   threats that you were making, the statements that you were

20   making about what you would do with regard to law enforcement

21   and government officials.

22   In the Government's Exhibit A, there are 24 instances

23   where you talk about intending to kill someone; there are 26

24   instances where you talk about assaulting or engaging in

25   aggravated assault; three instances of kidnapping and arresting

1  judges.  Did you carry any of those out?  Not yet.

2      Did you acquire the machine gun in order to do so?  I

3  believe you did.

4      Your statement, "that's why I wanted it," is very, very

5  telling, Mr. Wolf.

6      And as I've said, we're not using anybody else's -- or I'm

7  not using anyone else's statements against you, I'm using your

8  very own statements in trying to determine what is a sufficient

9  but not greater than necessary sentence.

10      And based on your statements, and in my view, how shocking

11  they are about cooking law enforcement in their Bear Cat, and

12  using the flamethrower and napalm, and "I know how to make it."

13  You, in my view, present an extremely dangerous individual.

14  And then given your belief that you and only you understand the

15  law, and that you and only you will interpret the Constitution

16  and then act accordingly to your interpretation, make you a

17  very dangerous individual and demonstrate your lack of respect

18  for the law.

19      The Constitution, yes; that is the law.  But there are

20  multiple other laws in our nation.  And we are a nation of

21  laws.  And that's the only way that we survive without anarchy.

22  And what you were espousing was anarchy.

23      So, in just looking at the charge or the charges on their

24  face, the guidelines may seem to apply.  Given the totality of

25  the circumstances and the facts of this case, in my view, they

1  do not.

2      Should you be sentenced to the maximum of 120 months?
3  Well, it's true, the court must take into consideration that
4  you don't have any criminal history.  That, thank goodness, up
5  to this point, you've never acted on any of the things that you
6  have talked about doing.

7      I mean, you espoused things that even the individuals of
8  like minds who attended the community of safety meetings -- or
9  the committee of safety meetings, didn't agree with and wanted
10  to talk you out of.  They were too extreme for those
11  individuals.  And you said:  "Well, that's just who I am."

12      And "you can try it your way, and probably won't work, and
13  then I'll come in and I'll do it my way."

14      It's a very serious offense, these charges, given the
15  context in which they were committed.  And there needs to be a
16  just punishment.  There needs to be a sentence that will
17  promote respect for the law in you.  And there needs to be a
18  sentence that will deter criminal conduct by you, but by others
19  of like mind.

20      Sure, you can criticize your government.  You can pretty
21  much say whatever you said here.  And we're a wonderful country
22  because of that.  But it's when you start taking steps to carry
23  out criminal acts, and then, in fact, commit a criminal act,
24  two, in fact, as you did, then you're going to be prosecuted.

25      There isn't necessarily, in my view, a reason to hope that

1  you would be deterred from this kind of criminal conduct.  A

2  lengthy sentence may just further cement your beliefs that the

3  government is corrupt and that people -- public officials

4  should be killed and removed and whatnot.  But perhaps that's a

5  risk I have to take.  Because too lenient of sentence, then,

6  doesn't deter you or anyone else from criminal conduct such as

7  this.

8      And it wouldn't protect the public from further crimes by

9  you.

10      Will you, while you are incarcerated, come around and

11  believe that what you did was wrong?  Not likely.  And so, the

12  public has to be protected from you for a certain amount of

13  time.  Not only through incarceration, but through supervised

14  release thereafter.

15      I thought it was an interesting analogy in the

16  government's sentencing memorandum, arguing that in addition to

17  the weapon being illegal for the fact that it was a machine

18  gun, a fully automatic shotgun, that it had an additional

19  illegal feature, that being the shortened barrel.  A shortened

20  barrel specifically requested by Mr. Wolf.

21      And analogizing that to the guideline enhancement for

22  additional -- the additional illegal feature, such as an

23  obliterated serial number.

24      Obviously, that guideline enhancement does not apply here.

25  But it's worth considering, at least the level that Congress

1   has determined should be added to -- to a base offense level,
2   simply for the fact that the weapon has an obliterated serial
3   number.

4        Well, wouldn't that apply to a weapon that was a sawed-off
5   shotgun, that had the additional illegal feature of a shortened
6   barrel that is much more easily concealed, and therefore, much
7   more lethal?

8        And if the court were to follow that analogy all the way
9   through, the guideline range would be 63 to 78 months, because
10  that would increase the total offense level to 26.

11       At least something that the court, I think, is -- that
12  it's worth the court considering in trying to determine just
13  what is appropriate here.

14       Was the jury influenced by your own statements, Mr. Wolf?
15  I don't know.  But -- and I'm sure that that will be one of the
16  first issues on appeal of whether all of that evidence was
17  correctly allowed in.  And I look forward to the Ninth
18  Circuit's ruling on that.

19       But in my view, the evidence was appropriate in setting
20  the scene for the jury, because of your denial that you wanted
21  this fully automatic shotgun, setting the scene for the jury
22  with your own words, as to what, in fact, you really wanted and
23  what your intent was.

24       So, considering what I think are extremely aggravating
25  factors that are not adequately represented or taken into

1  consideration by a guideline sentence of 41 to 51 months, it is

2  my judgment that a sentence of 72 months is sufficient but not

3  greater than necessary in order to accomplish the purposes of

4  sentencing.

5      And in rejecting the government's argument, the court does

6  take into consideration your lack of any criminal history and

7  the fact that at some point, we may have someone with some

8  significant criminal history who will be facing these same

9  charges.  And a person who presents under those circumstances

10  would certainly qualify for a more severe sentence.

11      Are you requesting any specific facility, Mr. Werner?

12          (A brief off-the-record discussion was had between

13          Mr. Werner and the defendant at counsel table.)

14          MR. WERNER:  The facility at Sheridan Oregon, Your

15  Honor.

16          THE COURT:  I will recommend that the Bureau of

17  Prisons place you in the facility located at Sheridan, Oregon.

18      Upon your release from imprisonment, you shall be placed

19  on supervised release for a term of three years.  And both the

20  custody sentence and the supervision sentence are to run

21  concurrently on each count.

22      Within 72 hours of your release from custody of the Bureau

23  of Prisons, you shall report in person to the probation office

24  in the district to which you are released.

25      While on supervised release, you shall not commit any

1   federal, state, or local crimes, and you shall not possess a

2   controlled substance.

3       You are prohibited from owning, using, or being in

4   constructive possession of firearms, ammunition, or other

5   destructive devices while on supervision and any time after the

6   completion of the period of supervision, unless granted relief

7   by the Secretary of the Treasury.

8       You shall cooperate in the collection of your DNA as

9   directed by your probation officer.

10      Further, you shall comply with the standard conditions of

11  supervision as recommended by the United States Sentencing

12  Commission and which have been approved by this court.

13      You shall also comply with the following special

14  conditions:

15      You shall participate in a program for mental health

16  treatment as deemed necessary by your probation officer until

17  such time as you are released from the program by your

18  probation officer.

19      You are to pay all or part of the cost of this treatment

20  as determined by your probation officer.

21      You shall submit your person, residence, place of

22  employment, vehicles, and papers, to a search, with or without

23  a warrant, by any probation officer, based on reasonable

24  suspicion of contraband or evidence in violation of a condition

25  of release.

1    Failure to submit to search may be grounds for revocation.

2    You shall warn any other occupants that the premises may

3  be subject to searches pursuant to this condition.

4    You shall allow seizure of suspected contraband for

5  further examination.

6    You shall be restricted from Park County and Gallatin

7  County, Montana, without prior written approval from the United

8  States Probation Office.

9    I find that you do not have the ability to pay a fine.

10  And I hereby waive the fine.

11    However, you are ordered to pay to the United States a

12  special assessment of $200, which shall be due immediately.

13    During the period of incarceration, you are ordered to pay

14  criminal monetary penalty payments at the rate of not less than

15  $25 per quarter.

16    Those payments shall be made through the Bureau of

17  Prisons' Inmate Financial Responsibility Program.  And they

18  shall be sent to the clerk of this court.

19    Mr. Wolf, you maintain your right to appeal all of the

20  issues related to your trial and sentencing in this matter.

21    If you wish to appeal, you must file your notice of appeal

22  within 14 days of today's date, or you will have waived that

23  right.

24    Do you understand that?

25    THE DEFENDANT:  The appeals will be filed.

1          THE COURT:  Any legal objection to the sentence,

2    Mr. Whittaker?

3          MR. WHITTAKER:  No, Your Honor.

4          MR. WERNER:  No, Your Honor.

5          THE COURT:  You are remanded to the custody of the

6    United States Marshals to carry out the judgment of the court.

7    And we're adjourned.

8              (The proceedings in this matter were adjourned at

9              12:32 p.m.)

10

11

12

13              C E R T I F I C A T E

14

15      **I certify that the foregoing is a correct transcript from**

16    **the record of proceedings in the above-entitled matter.**

17      **/s/ Tina C. Brilz, RPR, FCRR**

18      **Dated this 19th day of April, 2016.**

19

20

21

22

23

24

25