IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



FILED

JUN 06 2018

Clerk, U S District Court
District Of Montana
Billings

| UNITED STATES OF AMERICA, | Cause No. CR 15-49-BLG-SPW |
|---|---|
| Plaintiff/Respondent, | CV 18-02-BLG-SPW |
| vs. | ORDER DENYING § 2255 MOTION AND DENYING CERTIFICATE OF APPEALABILITY |
| WILLIAM KRISSTOFER WOLF, | |
| Defendant/Movant. | |

This case comes before the Court on Defendant/Movant William Krisstofer Wolf's motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. Wolf is a federal prisoner proceeding pro se.

**I. Preliminary Review**

Before the United States is required to respond, the Court must determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). But the Court should "eliminate the

1

burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II. Background

On April 17, 2015, a grand jury indicted Wolf on one count of possessing a machine gun, a violation of 18 U.S.C. § 922(o) (Count 1), and one count of possessing an unregistered firearm, a violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871 (Count 2). Both counts were based on the same weapon, an Izhmash Model Saiga-12 12-gauge shotgun modified to fire automatically and "sawed off," that is, having a barrel length under 18 inches. *See* Indictment (Doc. 7) at 2. Assistant Federal Defender Mark Werner was appointed to represent Wolf. *See* Order (Doc. 4).

Trial commenced on November 2, 2015. *See* Minutes (Doc. 53). The jury found Wolf guilty on both counts. *See* Verdict (Doc. 58).

A presentence report was prepared. At sentencing, an upward adjustment for obstruction of justice was rejected, but the Court adopted the remainder of the report without change. Based on a total offense level of 22 and a criminal history category of I, Wolf's advisory guideline range was 41 to 51 months. To fulfill the sentencing objectives of 18 U.S.C. § 3553(a), the Court varied upward to a

sentence of 72 months in prison, to be followed by a three-year term of supervised release. *See* Minutes (Doc. 84); Judgment (Doc. 85) at 2-3.

Wolf appealed. He challenged the denial of his pretrial motion *in limine* as untimely and, based on the First Amendment and Federal Rule of Evidence 403, denial of his motion to exclude statements he made in a webcast that were admitted to show his state of mind and to negate his defense of entrapment. He also challenged the sufficiency of the evidence negating entrapment and the reasonableness of his sentence. On May 24, 2017, Wolf's arguments were rejected and his conviction and sentence were affirmed. *See* Mem. (Doc. 101) at 2-4, *United States v. Wolf*, No. 16-30065 (9th Cir. May 24, 2017).

Wolf filed a petition for writ of *certiorari*. The United States Supreme Court denied the petition on October 2, 2017. *See* Clerk Letter (Doc. 104) at 1.

Wolf's conviction became final on October 2, 2017. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). He timely filed his § 2255 motion on January 2, 2018. *See* 28 U.S.C. § 2255(f)(1).

### III. Claims and Analysis

Wolf claims that counsel was ineffective in various respects. These claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). At this stage of the proceedings, Wolf must allege facts sufficient to support an inference (1) that counsel's performance fell outside the wide range of reasonable professional

3

assistance, *id.* at 687-88, and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the result of the proceeding would have been different, *id.* at 694.

## A. Audio Recordings

Wolf claims that counsel should have moved to suppress recordings of statements Wolf made in webcasts "that had nothing to do with a purchase of a shotgun." Mot. § 2255 (Doc. 105) at 5; Mem. (Doc. 106) at 3.

To prove the crimes alleged, the United States had to prove, among other things, that Wolf "knew" the firearm "was a machine gun" or "a shot gun with a barrel of less than 18 inches in length." Jury Instr. Nos. 40, 43 (Doc. 59 at 44, 47). Wolf also presented a defense of entrapment, so the United States had to prove, beyond reasonable doubt, *see Jacobson v. United States*, 503 U.S. 540, 549 (1992), either that Wolf was predisposed to commit the crime, or that government agents did not induce Wolf to commit the crime, *see, e.g., United States v. Gurolla*, 333 F.3d 944, 956 (9th Cir. 2003); *United States v. Williams*, 547 F.3d 1187, 1197 (9th Cir. 2008) (quoting *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994)).

Neither the First nor the Fifth Amendments prohibit the government from using a person's voluntary statements as evidence against them, "subject to evidentiary rules dealing with relevancy, reliability, and the like." *See, e.g., Wisconsin v. Mitchell*, 508 U.S. 476, 489-90 (1993); *Rhode Island v. Innis*, 446

4

U.S. 291, 300 (1980). Wolf did not and does not claim he did not mean what he said in his webcasts, and he said the same things at trial. He makes no allegations supporting an inference that counsel could have challenged the reliability of his statements.

Relevant evidence is evidence that tends to show a fact in dispute is more likely or less likely to be true. *See* Fed. R. Evid. 401. Wolf's webcast statements supported at least three inferences relevant to the elements and to the entrapment defense: first, Wolf wanted an exceptionally lethal weapon; second, he wanted a weapon that law enforcement authorities would not expect and would be ill-prepared to counteract; and third, he harbored these desires before, during, and independently of investigators' conduct and interaction with him. *Compare, e.g., Jacobson*, 503 U.S. at 550 (holding that government did not disprove entrapment because defendant's interest in child pornography arose after "he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations.").

Even relevant evidence may be excluded if it is more unfairly prejudicial than probative. *See* Fed. R. Evid. 403; *United States v. Hitt*, 981 F.2d 422, 423-25 (9th Cir. 1992). But Wolf's statements went to the central contested elements of the case: Wolf's "knowledge, motive, intent, and absence of mistake" as well as his "predisposition" and "lack of reluctance to commit the offense." *See* Mem.

5

(Doc. 101) at 3, *Wolf*, No. 16-30065 (9th Cir. May 24, 2017); *see also, e.g.*, *United States v. Chisum*, 502 F.3d 1237, 1241-42 (10th Cir. 2007). To exclude Wolf's statements as unduly prejudicial would have been tantamount to immunizing Wolf's conduct *because* he talked about what he wanted to do with the weapon. That is not the purpose of Rule 403.

To the extent Wolf also challenges counsel's failure to move to suppress the audio recordings of some of his conversations with an informant and an undercover agent, again, there was no legal foundation for suppression. A person does not have a reasonable expectation that others will not record and relay his conversations with others, so the Fourth Amendment does not require a warrant to authorize such recording. *See United States v. White*, 401 U.S. 745, 751-53 (1971); *Lopez v. United States*, 373 U.S. 427, 437-40 (1963). As for the recording of the jail phone call from Wolf to a friend, both parties were advised it could be recorded. *See* Gov't Trial Ex. 17 at 0:00-0:21. After that, using the phone constituted implied consent and did not violate the Fourth Amendment or other law. *See, e.g.*, *United States v. Verdin-Garcia*, 516 F.3d 884, 894-95 (10th Cir. 2008).

Counsel had no legal basis for excluding Wolf's recorded statements. Failure to file a motion that has no support in the law is not unreasonable. *See, e.g.*, *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). Nor was Wolf

6

prejudiced, because meritless motions are not granted. Wolf's allegations meet neither prong of the *Strickland* test. This claim is denied.

### B. Other Claims

Wolf had dealings with an informant, Edward Gray, and an undercover FBI agent, Gregory Rogers. When he was dealing with them, Wolf knew them only as "Ed" and "Dirty," respectively. Both testified at trial. In the following discussion, they are referred to as Gray and Rogers when they are acting as trial witnesses but are called Ed and Dirty when their words or actions before trial are at issue.

Wolf claims counsel should have subpoenaed phone records and FBI 302 reports to prove he had more contacts with Ed than indicated by the discovery produced by the United States; should have introduced evidence showing Wolf's lack of predisposition to commit the crimes alleged (he does not say what evidence this was); and should have introduced into evidence the magazine article Wolf had in mind when he asked Dirty to obtain the weapon. He also avers that counsel failed to adequately investigate or cross-examine Gray, Agent Deurmeier, and Rogers regarding "unrecorded deal d[e]fining meetings," thus losing the opportunity to prove they lied under oath; and failed to object to a statement by the prosecution that there was no recording of these meetings.

#### 1. Lack of Predisposition and *Guns & Ammo* Article

Wolf does not identify any evidence of lack of predisposition counsel could

7

have introduced but did not. *See* Mot. § 2255 at 8; Mem. at 6-7. The United States introduced into evidence the magazine article Wolf had in mind, and Wolf's counsel argued it supported the defense. *See* Mem. at 12; 4 Trial Tr. at 625:20-632:24; *see also id.* at 594:10-596:24, 607:9-23, 713:15-715:4, 722:8-19. Neither prong of the *Strickland* test is met. These two claims are denied.

### 2. Unrecorded Conversations and Lack of Recording

Before September 30, 2014, conversations between Wolf and Ed were not recorded. *See, e.g.*, 1 Trial Tr. (Doc. 92) at 81:11-19; 3 Trial Tr. (Doc. 94) at 464:1-465:17. Agent Deurmeier testified that Ed wore a recording device on September 30, 2014, and on March 18, 2015. *See* 1 Trial Tr. at 81:11-19, 121:9-23. When Wolf, Ed, and Dirty all met, Dirty wore the recorder. *See id.* at 92:6-93:2; 3 Trial Tr. (Doc. 94) at 470:18-20. Dirty wore the device on December 18, 2014. As he left the table at one point, some conversation between "Ed" and Wolf was not recorded. *See, e.g.*, Wolf Aff. Ex. D (Doc. 106-4) at 45 (302 report re: conversation of Dec. 18, 2014). The jury knew all this. *See, e.g.*, 1 Trial Tr. at 146:7-147:19.

Citing "Exhibit D," Wolf identifies things he believes are telling discrepancies, such as Gray's testimony that he, Wolf, and Dirty talked about "Russian-made shotguns" in October but he was surprised to hear about an "automatic shotgun" in December. *See, e.g.*, 3 Trial Tr. at 469:11-23, 471:2-472:5;

8

Wolf Aff. Ex. D (Doc. 106-4) at 13, 14-15. Shotguns can be Russian-made without being automatic. At any rate, Wolf does not explain how the discrepancies made the jury more likely or less likely to find an element of the offense or sustain the entrapment defense.

Neither prong of the *Strickland* test is met. These claims are denied.

### 3. Unreported Contacts and Failure to Impeach Agents

Agent Deurmeier and Gray testified that all conversations between Ed and Wolf were reported to Deurmeier. Wolf testified that this was not true. In the § 2255 motion, Wolf contends counsel should have proved there were more contacts between Ed and Wolf by tracking down phone records and extrapolating tower data to track Ed's movements.

First, to the extent Wolf believes 302 reports depend on or imply the existence of a recording, he is mistaken. A 302 report is a written summary of a conversation between an agent and a witness or suspect. Gray and Deurmeier testified that Ed reported all of his contacts with Wolf to Deurmeier. Neither Gray nor Deurmeier claimed that all contacts between Ed and Wolf were recorded.

Second, assuming, for the sake of argument, that Wolf would have been able to show he and Ed spoke more often than Deurmeier and Gray testified, it does not follow that counsel's performance was unreasonable. Wolf testified at trial that he thoroughly researched what firearm he wanted, thought he was getting it, and

9

wound up instead with a firearm other than the one he asked for. Each of Wolf's recorded statements, from the radio broadcast of May 27, 2014, to the recorded jail call on April 26, 2015—to say nothing of his own testimony at trial—strongly tended to negate the hypothesis that he was "induced" to do anything he was not predisposed to do. With little prospect of proving exactly what Ed said or did to talk Wolf into more than he asked for, the time and effort required to track down Ed's location information was not likely to pay off.

Third, even if counsel proved everything Wolf now claims he could and should have, there is no reasonable probability Wolf would have been acquitted. The prosecution's best witness was not Gray or Rogers or Deurmeier. It was Wolf. The statements Wolf made when he did not think law enforcement was listening were different from the statements he made in his post-arrest interview with Deurmeier. Those statements were different from what he told a friend in a recorded jail telephone call. And the story Wolf related to the jury at trial was convoluted and self-contradictory.

For instance, Gray texted Wolf and asked whether he wanted "the standard barrel on that shotgun or . . .the shortened military type barrel." Wolf responded, "Mil barrel." *See* Gov't Trial Ex. 14 (Doc. 66-1) at 1-2; 1 Trial Tr. at 113:1-114:15. Wolf later told a friend, via recorded jail call, that he asked Dirty for a model with "military specs" and believed that meant a fully automatic shotgun

10

with a 14-inch barrel. *See* 4 Trial Tr. at 538:25-540:22, 542:20-543:12. But in the post-arrest interview, which the jury watched, Wolf told Agent Deurmeier that he believed "military spec" meant a barrel of "22 inches, as opposed to a 27-inch shotgun." Gov't Trial Ex. 19C at 2:44-2:49.

In the interview, Wolf said he wanted the gun "for skeet shooting, home protection, things like that." 4 Trial Tr. at 536:2-7. In a recorded conversation among Wolf, Dirty, and Ed on January 28, Wolf said the gun's purpose was not hunting but "to clean house." 3 Trial Tr. at 358:16-359:4. At trial, Wolf claimed he thought home protection and "cleaning house" were the same thing. *See* 4 Trial Tr. at 591:4-592:20. Even then, Wolf pointed to another use he intended to make of the shotgun: "And when the war starts . . . . I would rather go out and scare the living hell out of some police officers . . . . [s]o that they would be given the opportunity to surrender. . . . Unfortunately, will they? History has shown they won't." *Id.* at 592:9-15.

To make sure he could "scare the living hell out of some police officers," Wolf told the jury he wanted to mount a flame thrower under the barrel of the gun. *See id.* at 633:1-16; *see also* Gov't Trial Ex. 12B at 2:39-2:51. Maybe, as Wolf said, "shotguns generally don't go through walls" and so are less likely to "hurt somebody in the next room." *Id.* at 591:13-15. But a flame thrower seems contraindicated for home protection.

11

In the interview, Wolf told Agent Deurmeier that he thought the shotgun Dirty fired in the video was a semiautomatic that cycled fast with multiple rapid trigger pulls. *See* 4 Trial Tr. at 538:8-20. The jury saw the same video Wolf saw. It was able to decide whether Wolf really thought Dirty pulled a trigger ten times in under two seconds. Agent Rogers testified that no one could do it: "Not on your best day. Not even close." 3 Trial Tr. at 346:14-348:9.

At trial, Wolf said he knew the shotgun Dirty fired in the video was fully automatic. But, for the first time,[1] Wolf said he believed Dirty would not deliver the weapon as shown in the video. He said he thought it would be converted to fire semi-automatically. He said Dirty shot the video because he wanted to "test" the gun first, "and then convert it," *see* 4 Trial Tr. at 601:25-602:20, an odd sequence of events. When Wolf was asked why he wanted to purchase a fully automatic short-barreled shotgun converted into a semiautomatic shotgun with a different barrel, he explained the difference between a Saiga and an Atchisson, *see* 4 Trial Tr. at 575:2-576:17, not the difference between a converted and a purchased semiautomatic Saiga with a legal barrel length. Twice, Wolf said he wanted a

---

[1] Agent Deurmeier testified that Wolf did not say, in the post-arrest interview, that he knew the weapon he saw in the video was fully automatic. *See* 4 Trial Tr. at 643:18-644:22. Wolf said he did say that after he initially said he did not know. *See id.* at 600:6-22. The jury saw the recorded interview and made its own decision. At any rate, the agent and Wolf agreed that Wolf did not say anything in the post-arrest interview about his belief that the weapon in the video would be "converted" from a fully automatic short-barreled version to a semiautomatic longer-barreled weapon.

12

Saiga in part because *Guns & Ammo* said "it's got a heavily-walled barrel." 4 Trial Tr. at 575:20, 595:16-17. But he also claimed he wanted to "remov[e] the barrel" and replace it. *See* 4 Trial Tr. at 632:16-19.

At trial, Wolf claimed there were "two questions I always ask: Is this your gun to sell? And have you illegally modified it?" Wolf said he did not want to ask Ed those questions, because "Ed Gray was not the seller, so therefore, he could not answer those questions." 4 Trial Tr. at 603:1-6. Wolf wanted to get the answers "straight from the horse's mouth," that is, from Dirty. *Id.* at 603:5-10. But, when Dirty said on the video that the work on the shotgun was done, Wolf claimed he believed not what Dirty said but what (Wolf said) Ed said. *See* 4 Trial Tr. 647:7-648:7, 651:6-13.

And what Wolf said Ed said was not what Ed said. In the recorded conversation of March 18, Ed told Wolf exactly what he was getting. After they watched the video of Dirty firing the weapon, Ed said Dirty's "supplier didn't have any of the full autos, so he had to switch this one over. And so it would—it's 600 for the gun and then a hundred and twenty-five to switch it over to full auto." Three times in that statement, Wolf interjected, "Right." After Ed said "A hundred twenty-five to switch it over to full auto," there is some static, and Wolf says, "725—I mean I'll do some horse trading if he wants, but I could care less, you know." Ed says, "The hundred and twenty-five is just the parts," and Wolf says,

13

"Yeah. Yeah." Gov't Trial Ex. 12A at 2:11-2:39. This conversation is not consistent with Wolf's claim that he believed Dirty had a Class 3 dealer who converted an automatic to a semiautomatic or with the extreme caution Wolf claimed he exercised to make sure the weapon he received was "[a]bsolutely, 100 percent legal." *See* 4 Trial Tr. at 605:1-606:19; *see also id.* at 583:8-24, 586:16-24, 589:2-25

In sum, Wolf's own description of his thinking and his actions did not make sense. A person who intended to legally purchase a legal weapon would not need to change his account of what he knew or what he was doing multiple times. This was not a case about individual trees, as an attempt to impeach the agents' credibility regarding who used specific words at specific times would suggest. The case was built on a dense forest of Wolf's own statements.

Wolf also points to his statement during the arrest that he thought the gun was a semiautomatic, Mem. at 6, and his statement in a recorded conversation that "I don't think a fully automatic is needed," Wolf Aff. Ex. C (Doc. 106-3) at 2. These are trees. The forest was far more significant.

Even if counsel had done what Wolf now claims he should have, there is no realistic possibility—much less a reasonable probability—that Wolf would have been acquitted on either count. All remaining claims, *see* Mot. § 2255 at 6, 9; Mem. at 4-5, 8-11, are denied.

14

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

None of Wolf's claims meets even the relatively low threshold required for a COA. Wolf does not identify any respect in which counsel's performance was unreasonable. Nor does he identify any reasonable probability of a different outcome if counsel had done anything differently. The case simply did not depend on the credibility of the government witnesses. The jury was able to hear Wolf's statements in his webcasts, his statements to the informant or undercover agent, and his recorded jail phone call with a friend. It was able to hear and also see Wolf's interview with Agent Deurmeier and, of course, Wolf's testimony at trial. All those statements, and the changes and contradictions among them, resulted in Wolf's conviction. As there was no legal basis for counsel to challenge the

admission of Wolf's recorded statements, there is no reason to encourage further proceedings. A COA is not warranted.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Wolf's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 105) is DENIED.

2. The motion for decision (Doc. 110) is MOOT.

3. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Wolf files a Notice of Appeal.

4. The Clerk of Court shall ensure that all pending motions in this case and in CV 18-02-BLG-SPW are terminated and shall close the civil file by entering judgment in favor of the United States and against Wolf.

DATED this 5th day of June, 2018.

Susan P. Watters
United States District Court